**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

LEGION LEGALTECH, CORP.,
500 Race Street, #5416
San Jose, California 95126

      Plaintiff,

  v.

UNITED STATES OF AMERICA;

UNITED STATES DEPARTMENT OF
COMMERCE;

HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;

BUREAU OF INDUSTRY AND
SECURITY;

JEFFREY KESSLER, in his official
capacity as Under Secretary of Commerce
for the Bureau of Industry and Security;

EXECUTIVE OFFICE OF THE
PRESIDENT; and

DOE DEFENDANTS 1-10,

      Defendants.

CASE NO.: 1:26-cv-02225

**COMPLAINT FOR:**
**(1) ULTRA VIRES - EXCESS OF EXPORT
CONTROL AUTHORITY**
**(2) ULTRA VIRES UNDER IEEPA /
VIOLATION OF THE BERMAN
INFORMATIONAL-MATERIALS
EXEMPTION**
**(3) APA - ARBITRARY AND
CAPRICIOUS AGENCY ACTION**

**COMPLAINT**

1.      Plaintiff Legion LegalTech, Corp. ("Legion") respectfully submits this Complaint against the United States of America, the United States Department of Commerce ("Commerce"), Howard Lutnick, in his official capacity as Secretary of Commerce, the Bureau of Industry and Security ("BIS"), Jeffrey Kessler, in his official capacity as Under Secretary of Commerce for BIS, the Executive Office of the President, and Doe Defendants 1 through 10 (collectively, the "Defendants"), and alleges as follows:

**NATURE OF THE COMPLAINT AND RELIEF SOUGHT**

2.      This is a challenge to an unlawful directive that exceeds every source of statutory authority on which it could conceivably rest. On June 12, 2026, the federal government ordered Anthropic, PBC ("Anthropic") to immediately disable two of its most capable artificial-intelligence ("AI") models — Fable 5 and Mythos 5 — for every foreign national on Earth (the "June 12, 2026 Directive"). The order reached Anthropic by letter from Commerce's BIS, gave the company ninety minutes to comply under threat of "prompt criminal and civil penalties," and purports to rest on the export-control authority that Commerce and its BIS administer. Within hours, hundreds of millions of users — including citizens of the United States' closest allies and Anthropic's own employees — lost access. The government is not authorized to do what it did.

3.      Legion is a U.S.-based AI-native litigation-technology company that builds drafting and case-management tools for attorneys on top of frontier AI models. Legion is a commercial customer of Anthropic with a contractual right and license to access and use Fable 5 model, which was integral to building and operating its platform. Legion's software development team includes Canadian nationals working remotely from Canada, a Five Eyes intelligence partner and a Country Group A:5 nation under Defendants' own Export Administration Regulations ("EAR"). When the directive took effect, Legion lost the latest tool at the center of its development instantaneously.

4.      The directive is unlawful under any statutory authority Defendants might invoke, and Legion brings three causes of action to set it aside.

5.      First, the directive exceeds the export-control authority conferred by the Export Control Reform Act ("ECRA"), 50 U.S.C. §§ 4801–4852, and EAR, 15 C.F.R. Parts 730–774. The only export-control classification that ever directly covered advanced AI model weights — ECCN 4E091 — was rescinded in May 2025 with no replacement. No currently operative provision of

the Commerce Control List classifies access to a hosted AI model, or its inferential text output, as a controlled item. Commerce cannot enforce a control that does not exist. Even if some operative control reached this conduct, the directive regulates outside the statutory and regulatory definition of an "export." The EAR's "deemed export" framework reaches only the release of "technology" or "source code," expressly "but not object code," and providing a person with access to a hosted AI model that returns text in response to prompts releases no technology, source code, model weights, or technical data to the user. The two specific statutory bases the directive invokes — Section 4817(b)(1) (interim controls) and 15 C.F.R. § 744.22(b) ("is informed" letters) — are patent misconstructions. The first requires notice-and-comment rulemaking and multilateral coordination that never occurred. The second is a targeted, case-specific tool for identified military-intelligence end-use risks, not a mechanism for imposing blanket worldwide bans untethered from any identified end user or end use. Because ECRA precludes Administrative Procedure Act ("APA") review of BIS control-list functions but does not preclude all forms of judicial review, Legion brings this claim as a nonstatutory ultra vires action — a form of equitable relief that the D.C. Circuit has repeatedly held remains available under ECRA.

6.      Second, to the extent the directive rests on the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1707, it violates express prohibitions and mandatory prerequisites that Congress built into that statute. The Berman Amendment categorically excludes from the President's IEEPA authority any power to regulate or prohibit — whether directly or indirectly — the exportation of information or informational materials in any format or medium of transmission. 50 U.S.C. § 1702(b)(3). The statute does not limit this authority — it withholds it entirely. The President's IEEPA power "does not include" the authority to restrict informational materials. Id. The expressive outputs that Legion receives from the Fable 5 model — drafted text,

3

written legal analysis, summaries, and similar composed material — are informational materials within the meaning of this provision, and the directive's purpose and effect are to stop the flow of those materials to their recipients. The directive independently fails because no national emergency has been declared with respect to the purported threat — the code-analysis capability of a commercially hosted AI model. Because the alleged threat does not have its "source in whole or substantial part outside the United States" as § 1701(a) requires. The model was developed by a U.S. company, hosted in the United States, and offered through a U.S. commercial platform. The directive further asserts authority of vast economic and political significance, a de facto licensing regime under which any frontier AI model must "go through the administration," that IEEPA does not clearly and explicitly confer. Because IEEPA grants authority to the President and the President is not an "agency" under the APA, nonstatutory ultra vires review is the only mechanism through which Legion may challenge whether the directive exceeds the limits Congress imposed.

7.      Third, to the extent the directive is reviewable under the APA, it is arbitrary and capricious agency action. The directive lacks a rational connection between the asserted threat, a narrow jailbreak allowing a model to review software code, and the remedy selected — a categorical worldwide suspension of access by any foreign national regardless of nationality, location, employer, or purpose. It is materially underinclusive. The identical code-analysis capability remains publicly available through competing products the directive left untouched, including OpenAI's GPT-5.5. Defendants failed to consider obvious less-restrictive alternatives, including restricting access only for nationals of adversary nations. And Defendants failed to exercise their own reasoned judgment. On information and belief, the directive was precipitated not by any neutral agency assessment but by telephone calls from Anthropic's commercial rivals

over a single evening, followed by a ninety-minute ultimatum and no disclosed independent analysis.

8.     The directive did not emerge in isolation. In the months preceding it, the administration engaged in an escalating campaign against Anthropic after the company refused to grant the Department of Defense unrestricted access to its AI tools. The President publicly ordered all federal agencies to stop using Anthropic's technology, the Secretary of Defense designated Anthropic a "supply chain risk," and the President threatened Anthropic with "major civil and criminal consequences." [1] A court in the Northern District of California has already found that an earlier government action against Anthropic under a national-security label was likely pretextual and that the government's real motive was unlawful retaliation. *Anthropic PBC v. U.S. Dep't of War*, No. 26-CV-01996-RFL, 2026 WL 836842, at \*17 (N.D. Cal. Mar. 26, 2026). The June 12, 2026 Directive, issued on an emergency basis, without process, targeting only Anthropic's models while leaving identical capabilities available in competing products, is the culmination of that retaliatory campaign. An unsupported assertion of national security will not save it.

9.     The directive is also irreconcilable with the President's own contemporaneous Executive Order. On June 2, 2026, ten days before the directive, the President signed an Executive Order which expressly disclaimed authority to impose "a mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." *Promoting Advanced Artificial Intelligence Innovation and Security*, 91 FR 34565. The directive imposed precisely such a requirement. Where

---

[1] O'Brien, Matt and Konstantin Toropin, *Trump Orders US Agencies to Stop Using Anthropic Technology in Clash Over AI Safety*, AP News (Feb. 27, 2026), https://apnews.com/article/anthropic-pentagon-ai-hegseth-dario-amodei-b72d1894bc842d9acf026df3867bee8a.

the Executive publicly disclaims a power and then exercises it, the inference that no statute confers the power is compelling.

10.    The harm to Legion is immediate, irreparable, and existential. The pace of frontier AI advancement is blistering, and competitive ground lost during a suspension cannot be regained after the fact. Each day the directive remains in force disrupts Legion's product, operations, sidelines its engineers, and erodes the company's ability to survive in a field defined by continuous access to the most capable models. Because Legion's claims lie against the federal government, its economic losses are unrecoverable as damages, and equitable relief is the only adequate remedy.

11.    The stakes reach beyond Legion. The directive asserts a power to switch off a lawful and already-published commercial information service relied upon by hundreds of millions of users worldwide, on a national-security label unsupported by any disclosed evidence and contradicted by the government's own conduct. Left standing, it would establish that the Executive may, by unreviewed command, disable any frontier AI model at will — placing every customer, developer, and business that depends on these tools at the mercy of an unexplained exercise of claimed authority that no statute confers. Legion respectfully asks this Court to declare the directive unlawful, to vacate and set it aside, and to enjoin its enforcement against Legion and its personnel so that access may be restored.

## THE PARTIES

12.    Plaintiff Legion is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 500 Race St., #5416, San Jose, California 95126. Legion is an AI-native litigation-technology company that builds drafting and case-management tools for attorneys on top of frontier AI models. Legion is a commercial customer of Anthropic, PBC under Anthropic's Commercial Terms of Service and had a contractual right and license to

access and use Anthropic's Fable 5 model. Legion's software development team includes Canadian nationals who work remotely from Canada. The June 12, 2026 Directive directly and immediately stripped Legion of access to the tool at the center of its product development, disrupted its operations, and sidelined its engineers — inflicting concrete, particularized, and ongoing injury.

13. Defendant the United States of America is a sovereign nation and is sued pursuant to the waiver of sovereign immunity in 5 U.S.C. § 702.

14. Defendant the United States Department of Commerce ("Commerce") is a department of the executive branch of the United States government responsible for administering export controls and is the department under whose authority the challenged directive was issued. Commerce is headquartered in Washington, D.C.

15. Defendant Howard Lutnick is sued in his official capacity as the Secretary of Commerce and the head of Commerce. He is the official with ultimate supervisory authority over BIS and the export-control functions exercised through the challenged directive.

16. Defendant the Bureau of Industry and Security ("BIS") is an agency within Commerce charged with administering and enforcing the EAR, 15 C.F.R. Parts 730–774, and is the agency that issued or effectuated the June 12, 2026 Directive challenged herein. BIS is headquartered in Washington, D.C.

17. Defendant Jeffrey Kessler is sued in his official capacity as the Under Secretary of Commerce and is the head of BIS. He is the official responsible for the administration and enforcement of the EAR, including the issuance and enforcement of the challenged directive.

18. Defendant the Executive Office of the President is an entity within the executive branch of the United States government. On information and belief, and according to public

reporting, the directive challenged herein was issued or directed through the White House, including by directing BIS to issue the June 12, 2026 letter to Anthropic, informing it that the Fable 5 and Mythos 5 models would be subject to export-control restrictions. The Executive Office of the President is named as a defendant with respect to Legion's ultra vires. Legion does not assert its APA claim against the Executive Office of the President.

19.    Doe Defendants 1 through 10 are federal departments, agencies, offices, officials, or instrumentalities – including responsible officials within them – beyond those specifically identified above that participated in the development, issuance, or implementation of the June 12, 2026 Directive. All individual officials among the Doe Defendants are sued in their official capacities. Their true names and capacities are presently unknown to Legion, and Legion will seek leave to amend this Complaint to identify them as their identities and roles become known.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including ECRA, 50 U.S.C. §§ 4801–4852; IEEPA, 50 U.S.C. §§ 1701–1706; and the APA, 5 U.S.C. §§ 701–706.

21.    The Court is authorized to grant the relief requested under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; the All Writs Act, 28 U.S.C. § 1651; the APA, 5 U.S.C. §§ 702, 705, and 706, to the extent the challenged directive is reviewable thereunder; and the Court's inherent equitable power.

22.    The Court has personal jurisdiction over Defendants. The United States, Commerce, and BIS are subject to suit in any federal district court under 5 U.S.C. § 702. The Secretary of Commerce and the Under Secretary of Commerce for Industry and Security are sued

8

in their official capacities and are subject to personal jurisdiction in this district under 28 U.S.C. § 1391(e)(1).

23.    Sovereign immunity is waived under 5 U.S.C. § 702, which provides that an action seeking relief other than money damages and stating a claim that an agency or officer acted or failed to act in an official capacity shall not be dismissed on the ground that it is against the United States.

24.    This Court also has authority to enjoin unlawful official action that is ultra vires, *see, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."), or that violates the Constitution, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The Supreme Court has long held that federal courts have equitable power to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–91 (1949).

25.    Venue is proper in the District of Columbia, under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## STATEMENT OF FACTS

### A.    Legion and Its Business

26.    Legion is a U.S.-based litigation-technology company that builds drafting and case-management tools for attorneys on top of frontier AI models. Legion's products and operations depend on continuous access to the most capable commercially available AI models.

27.     Legion is a commercial customer of Anthropic through the Anthropic API under Anthropic's Commercial Terms of Service. Additionally, Legion maintains a Zero Data Retention agreement with Anthropic.

28.     Legion accesses Anthropic's models through business accounts under its organization, including Anthropic's agentic coding tool, which Legion's developers used to build its platform, and through Amazon Web Services' Amazon Bedrock platform for pre-production testing, in each case under Anthropic's applicable commercial terms. Under that commercial relationship, Legion had a contractual right and license to access and use Anthropic's Fable 5 AI model. Fable 5's capabilities made it immediately integral to the active development of Legion's platform and it was being fast tracked for deployment to Legion's customers.

29.     Legion's software development team includes Canadian nationals who work remotely from Canada. These engineers were actively using Anthropic's Fable 5 model to perform the software-engineering work for which Legion engaged them when access was terminated. Legion's founder and principal, who is based in the United States, is himself a practicing litigator and software developer who relied on the Fable 5 model in developing Legion's platform and was impacted when access was terminated. By its terms, the directive bars nearly the entire development team from using the models Legion has a contractual right to access and use under its commercial agreements with Anthropic.

**B.     Events Leading to the June 12, 2026 Directive**

30.     Anthropic publicly released Fable 5, a general-use version of its more powerful Mythos 5 model, on or about June 9, 2026. According to public reporting, Anthropic had notified the Government multiple times in advance of the planned release, and the Government did not object.

31. Legion did not have access to the underlying model weights, the object code, or the source code of the Fable 5 or Mythos 5 models. Upon information and belief, no party inside or outside the United States had such access.

32. On information and belief, and according to public reporting, on the evening of June 11, 2026, Amazon.com, Inc. contacted senior administration officials to share a report describing a method by which Amazon stated it had been able to "jailbreak" Fable 5. Amazon is a major investor in Anthropic and, through Amazon Web Services, one of its principal cloud providers and commercial counterparties. On information and belief, calls from Amazon to a variety of senior administration officials over the same evening and the following morning preceded the decision to suspend the models, and no neutral or disclosed agency assessment of supply-chain or national-security risk preceded the directive.

33. On information and belief, and according to public reporting, on June 12, 2026, the Government telephoned Anthropic and gave the company ninety minutes to take Fable and Mythos down on the basis of an unspecified "national security threat," providing no further detail concerning the asserted threat. At approximately 5:30 p.m. Eastern that day, BIS, on the authority of Commerce, sent Anthropic's chief executive a letter—a so-called "Is Informed" letter— informing it that, on information and belief, the Fable 5 and Mythos 5 models would be subject to sweeping export-control restrictions, including a worldwide license requirement reaching all "foreign persons" wherever located. Within hours, by approximately 10:00 p.m., users, including Legion, lost access to Fable.

34. According to public reporting, under the restrictions, Anthropic's most advanced models would be inaccessible not only to foreign adversaries – access Anthropic was already preventing on its own – but also to United States allies and to foreign nationals within the United

States. The restrictions thus added nothing as to adversaries and operated principally to bar access by allied and domestic foreign nationals.

**C.     The June 12, 2026 Directive**

35.     The June 12, 2026 Directive ordered Anthropic to suspend all access to its Fable 5 and Mythos 5 models by "any foreign national, whether inside or outside the United States, including foreign-national Anthropic employees."

36.     The stated basis for the directive was the aforementioned "jailbreak" that allowed a user to prompt the model to review third-party software and identify flaws in it. In other words, a typical use of nearly every flagship LLM.

37.     The directive issued without prior notice to Legion or other affected customers, without disclosure of the evidence supporting the directive, and without any hearing or pre-deprivation process.

38.     The directive did not distinguish between foreign nationals of adversary nations and foreign nationals of close treaty allies such as Canada. It imposed a blanket, worldwide bar on access by "any foreign national" without exception.

**D.     Anthropic's Response and Public Statement**

39.     To ensure compliance with the directive, Anthropic disabled Fable 5 and Mythos 5 for all users. Anthropic's suspension of access was caused by, and is the direct, foreseeable, and predictable result of, Defendants' directive. Anthropic took no independent action to restrict Legion's access; it complied with the government's command under threat of enforcement consequences.

40.     In a public statement, Anthropic disputed the basis for the directive.

41.     According to Anthropic's statement, after being informed that the Government would impose the export-control restrictions, Anthropic's chief executive and other officials spoke with the administration and explained that the identified capability "is widely available from other models" and that they disagreed "that the finding of a narrow potential jailbreak should be cause for recalling a commercial model deployed to hundreds of millions of people."[2]

42.     An independent security researcher with whom Anthropic shared the report publicly stated that the Government's response "seems way out of line with what's actually in the research report," explaining that the researchers had identified security vulnerabilities by asking the kinds of questions defenders ordinarily ask of an AI model – precisely the defensive use the model was intended to serve – and that AI models must be able to assist defenders in this way.

43.     Access to all other Anthropic models was unaffected by the directive. Only the Fable 5 and Mythos 5 models were suspended.

44.     The code-analysis capability identified as the basis for the directive remains available to the public through competing products that the directive did not restrict, including OpenAI's GPT-5.5, which remained available for selection and use as of the date of this Complaint.

45.     The directive did not emerge in isolation. In the months preceding the June 12, 2026 Directive, the administration engaged in an escalating public campaign against Anthropic. In late February 2026, after Anthropic refused to grant the Department of Defense unrestricted access to its AI tools — insisting only that its products not be used for "mass surveillance" or "fully autonomous weapons" — President Trump publicly ordered all federal agencies to stop using

---

[2] *See* Anthropic's "Statement on the US government directive to suspend access to Fable 5 and Mythos 5," (available at https://www.anthropic.com/news/fable-mythos-access) (last accessed June 21, 2026).

Anthropic's technology, writing on social media: "We don't need it, we don't want it, and will not do business with them again!" The Secretary of Defense designated Anthropic a "supply chain risk," a classification typically reserved for companies owned by U.S. adversaries. The President further stated that Anthropic "better get their act together, and be helpful during this phase out period, or I will use the Full Power of the Presidency to make them comply, with major civil and criminal consequences to follow."

46.    On information and belief, the directive to disable Fable 5 and Mythos 5 for all foreign nationals worldwide is the administration's fulfillment of that threat — an exercise of "the Full Power of the Presidency" against a company that exercised its right to decline unrestricted government use of its products. The use of export-control authority for this purpose is not an exercise of the discretion Congress committed to Commerce and BIS; it is the deployment of statutory machinery to punish a private company's exercise of its own contractual and business judgment. A court in this District recently found that an Executive Order targeting a private entity under a national-security label was "on its face, retaliation for the [entity's] protected" conduct, and that the "unsupported assertion of national security will not save it!" *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 151-57 (D.D.C. 2025), *amended sub nom. Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. CV 25-917 (RJL), 2025 WL 2105262 (D.D.C. June 26, 2025). The same analysis applies here with equal force.

47.    On June 2, 2026 — ten days before the directive — the President signed an Executive Order entitled "Promoting Advanced Artificial Intelligence Innovation and Security." That Order directed the development of a "voluntary framework" under which AI developers could engage with the government to determine whether their models meet the designation of "covered

frontier model." Section 3(c) of the Order expressly provided: "Nothing in this section shall be construed to authorize the creation of a mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." The June 12, 2026 Directive imposed precisely such a mandatory licensing requirement, with immediate effect and under threat of "prompt criminal and civil penalties." The directive is thus inconsistent with the Executive's own articulated policy as of ten days before its issuance — further evidence that the directive was not the product of reasoned export-control decisionmaking, but of a retaliatory impulse untethered from any statutory authorization.

**E.      Harm to Legion**

48.      The suspension abruptly terminated Legion's access to the Fable 5 model, disrupting its development and operations. This injury is concrete and actual. Legion lost access to the specific AI model at the center of its product development, and that loss is ongoing.

49.      As a result of the June 12, 2026 Directive, Legion's Canadian-national engineers cannot use the tools that Legion has a contractual right to access and use to perform the work for which they were engaged.

50.      For an AI-native litigation-technology company, continuous access to the most capable models is the foundation of the product and of the company's ability to compete. It is exactly these models that allow Legion to create and offer its competitive services. Without uninterrupted access to frontier models, Legion's competitors will outpace Legion in capability Lost ground cannot be recovered after the fact. The June 12, 2026 Directive's across-the-board suspension does not harm all developers alike. For a small, senior team like Legion's, continuous access to the most capable commercially available model is a force multiplier that allows Legion

15

to out-build far larger and better-funded engineering organizations. When that access is stripped away — as the suspension does to every developer — those competitors' structural advantages in headcount and capital reassert themselves, allowing better-resourced teams to build faster than a team of Legion's size for as long as the directive stands.

51.     Legion has Article III standing to maintain this action. Legion has suffered an injury in fact that is concrete, particularized, and actual — not conjectural or hypothetical. The June 12, 2026 Directive caused the immediate termination of Legion's access to the Fable 5 model, disrupted Legion's product development and operations, barred Legion's Canadian-national engineers from performing the work for which they were engaged, and threatens the continued viability of the company. These are tangible monetary and operational harms of the kind that have long provided the basis for lawsuits in American courts. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-41 (2016), as revised (May 24, 2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021).

52.     Legion's injuries fall within the zone of interests protected by ECRA. Congress enacted ECRA not only to advance national security but also to ensure that export controls are applied in a manner that does not unnecessarily impede legitimate commerce. ECRA expressly provides that "United States persons engaged in the lawful export or reexport of items" shall not be subject to controls that exceed those authorized by the statute, and it limits BIS's authority to specific categories of items, end uses, and end users. 50 U.S.C. §§ 4812(b), 4813(a). The EAR's own architecture reflects this balance by incorporating nationality-based distinctions — including Country Group A:5, which encompasses Canada — that define the permissible scope of "deemed export" controls. 15 C.F.R. § 734.20. Legion is a United States company whose lawful commercial use of a tool that transmits no controlled technology was disrupted by a directive that overrode the

16

very structural limitations Congress built into the export-control framework. Legion's interest in being free from irrational and unauthorized export controls that disrupt its lawful commercial activities is squarely within the zone of interests ECRA was designed to protect.

53.    Legion's injuries are redressable by a favorable ruling. A judgment vacating the directive and enjoining its enforcement would remove the sole legal impediment to Anthropic's restoration of Legion's access to the Fable 5 model. Anthropic disabled the models solely because the directive compelled it to do so. Nothing other than the directive prevents Anthropic from restoring Legion's access. The redressability inquiry requires only that the plaintiff "show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 121 (2025) (internal citations omitted). Vacatur of the directive would remove the government-imposed barrier. Anthropic's restoration of the services — the only step needed to redress Legion's harm — is not speculative but virtually certain, given Anthropic's public opposition to the directive and its stated desire to restore service. Because Legion's economic losses against the federal government are unrecoverable as damages, equitable relief is the only adequate remedy.

54.    The loss of access to the frontier models on which Legion's product is built threatens the continued viability of the company itself.

55.    Because Legion's claims sound against the federal government, its economic losses are unrecoverable as damages, and the injury is therefore irreparable. Vacatur of the directive would permit Anthropic to restore Legion's access to the Fable 5 model, making equitable relief both necessary and adequate to redress Legion's harm.

56.    Anthropic's compliance was the direct, foreseeable, and predictable consequence of Defendants' command, not an independent exercise of Anthropic's own judgment. A judgment

17

vacating the directive and enjoining its enforcement would therefore redress Legion's injuries by removing the sole legal impediment to the restoration of Legion's access. *See Diamond Alternative Energy,* 606 U.S. at 112 ("[T]here is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**

**(Ultra Vires - Excess of Export Control Authority)**
**Against All Defendants**

57.     Legion realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

58.     The June 12, 2026 Directive purports to rest on the export-control authority conferred by the ECRA, 50 U.S.C. §§ 4801-4852, and administered through the EAR, 15 C.F.R. Parts 730-774. ECRA, 50 U.S.C. § 4821(a), precludes judicial review under the APA of BIS control-list functions, but it does not expressly preclude all forms of judicial review. Section 4821(a) withdraws only APA review. It says nothing about judicial review in general or about the equitable jurisdiction of federal courts to enjoin agency action taken in patent excess of statutory authority. *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (holding that nonstatutory ultra vires review survived ECRA's preclusion of APA review because § 4821(a) "does not expressly preclude all judicial review"); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721-22 (D.C. Cir. 2022) (applying ultra vires review to ECRA challenge after finding APA review barred under § 4821(a)). Because the statutory preclusion is implied rather than express, nonstatutory ultra vires review remains available. Legion therefore brings this claim as an action in equity to set aside agency conduct that is ultra vires – entirely in excess of any delegated statutory authority – reviewable under the court's inherent equitable power

18

to reestablish the limits on executive authority and the general waiver of sovereign immunity, 5 U.S.C. § 702.

59.     There is no alternative procedure for review of the statutory claims raised in this cause of action.[3] ECRA, 50 U.S.C. § 4821(a), expressly removes APA review of BIS's exercise of its control-list functions — the very functions through which the June 12, 2026 Directive was issued and enforced. No other statute provides a mechanism through which Legion may obtain judicial review of whether BIS exceeded the specific statutory limits on its export-control authority under ECRA. The directive left Legion with no administrative process through which to obtain an exemption, license, reconsideration, or stay before or after access was terminated, and no administrative appeal or petition for review is available under ECRA or the EAR to challenge BIS's assertion of control-list jurisdiction over items that are not on the Commerce Control List.

60.     The June 12, 2026 Directive is "entirely in excess of its delegated powers and contrary to a specific prohibition" in ECRA and EAR. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal citations omitted) (quoting *Bhd. of Ry. & S. S. Clerks, Freight Handlers, Exp. & Station Emp. v. Ass'n for Benefit of Non-Cont. Emp.*, 380 U.S. 650, 660 (1965). As set forth below, the directive is not a debatable exercise of delegated discretion but a patent departure from the specific and mandatory limits Congress imposed on BIS's export-control authority — the kind of "extreme" agency error that warrants the immediate intervention of an equity court. *See*

---

[3] To the extent Legion separately asserts an APA claim in its Third Cause of Action, that claim addresses whether the directive is arbitrary and capricious in its reasoning and process — a distinct inquiry from whether Defendants acted entirely outside their delegated statutory authority. APA arbitrary-and-capricious review does not provide a meaningful and adequate opportunity to obtain the relief this cause of action seeks: a determination that the directive is void ab initio as an exercise of power Congress never conferred. *See Fed. Express*, 39 F.4th at 764 (D.C. Cir. 2022) (proceeding to ultra vires review under ECRA after finding APA review barred by § 4821(a)); *Changji Esquel Textile*, 40 F.4th at 721–22.

*Fed. Express*, 39 F.4th at 764. The directive transgresses those limits in multiple independent respects, any one of which renders it ultra vires.

61.    The directive is ultra vires for an antecedent reason that requires no debatable construction of the statute: there is no operative control-list classification that reaches what the directive purports to regulate. ECCN 4E091 – the only classification that ever directly controlled advanced AI model weights – was rescinded in May 2025 with no replacement. No currently operative Export Control Classification Number, and no other provision of the Commerce Control List, classifies access to a hosted AI model, or the inferential text output of such a model, as a controlled export. An agency charged with administering a control list acts outside its delegated authority when it suspends access to an item the list does not reach; Commerce cannot enforce a control that does not exist.

62.    In any event, even if some operative control reached this conduct, the directive regulates outside the statutory and regulatory definition of an "export." The EAR's "deemed export" framework reaches only the release of "technology" or "source code" – expressly "but not object code" – to a foreign national, and requires the release of the controlled information itself. 15 C.F.R. §§ 734.13, 734.15.

63.    Providing a person with access to a commercially hosted AI model that accepts text prompts and returns text outputs releases no source code, model weights, training data, or "required" technical know-how to the user. The user receives only inferential text output. No "technology" or "source code" within the meaning of the EAR is exported, re-exported, or deemed exported.

64.    The limits the EAR places on what constitutes an export are specific and unambiguous. The regulations reach the release of "technology" or "source code," expressly "but

not object code," and require the release of the controlled information itself. Nothing in ECRA or the EAR authorizes Defendants to treat the delivery of inferential text output – a transaction that transmits no technology, source code, model weights, or required technical data – as an export or deemed export. Defendants' action is therefore not a debatable exercise of judgment but a departure from the specific and mandatory limits of the governing statute and regulations.

65.    Upon information and belief, the BIS letter to Anthropic's chief executive, sent on June 12, 2026, purports to invoke two specific statutory bases: (i) 50 U.S.C. § 4817(b)(1), which authorizes BIS to "establish interim controls on emerging and foundational technologies that are essential to the national security of the United States"; and (ii) 15 C.F.R. § 744.22(b), which authorizes BIS to "require a license for the export, reexport, or transfer (in-country) of any item subject to the EAR because there is an unacceptable risk of use in, or diversion to, a 'military-intelligence end use' or a 'military-intelligence end user.'" Upon information and belief, the letter separately cites 50 U.S.C. § 4813(a)(15) (authority to inform a person by specific notice that a license is required), which is procedural and confers no independent substantive authority of its own. Neither substantive basis supports the directive actually issued.

66.    Section 4817(b)(1) authorizes BIS to establish controls—"including through interim controls (such as by informing a person that a license is required for export)"—only on "technology identified pursuant to subsection (a)." 50 U.S.C. § 4817(b)(1). Subsection (a), in turn, requires that emerging and foundational technologies be identified through "a regular, ongoing interagency process" that, by statute, "shall … include a notice and comment period." 50 U.S.C. § 4817(a)(2)(C). On information and belief, the Fable 5 and Mythos 5 models were never identified through that interagency process, and no notice-and-comment period was afforded. Because the models were never "identified pursuant to subsection (a)," there is no validly identified technology

21

to which any control—interim or otherwise—could attach. The statute's express authorization of "interim controls (such as by informing a person that a license is required)" therefore does not save the directive: the interim-control mechanism presupposes a technology lawfully identified under subsection (a), and, on information and belief, a license requirement imposed "until further notice" that remains in effect until superseded by a later BIS letter is indefinite rather than genuinely interim. Defendants' invocation of § 4817(b)(1) is therefore a patent misconstruction of the statute.

67.     Section 744.22(b) authorizes BIS to issue an "is informed" letter requiring a license where there is an "unacceptable risk" that a specific item will be used in or diverted to a "military-intelligence end use" or by a "military-intelligence end user" as defined in § 744.22(a) and (f) of the EAR. This provision is designed for targeted, case-specific notifications where BIS has identified a particular end-use or end-user concern. It has never been used, and was never designed, to impose blanket license requirements applicable to "all destinations worldwide" and "all 'foreign persons' wherever located" regardless of identity, purpose, or relationship to any military or intelligence activity. The directive does not identify any military-intelligence end user; it does not identify any military-intelligence end use; it imposes a categorical, worldwide restriction untethered from any specific end-use or end-user risk. A provision authorizing targeted risk-based restrictions does not authorize universal prohibitions; Defendants have stretched a narrow, case-specific tool into a *de facto* worldwide ban, and in doing so have plainly crossed the line Congress drew.

68.     Moreover, § 744.22 does not, by its terms, reach the persons or destinations the directive targets. The control applies only where an item is destined for a "military-intelligence end use" in—or a "military-intelligence end user" from—Belarus, Burma, Cambodia, the People's Republic of China, Russia, or Venezuela, or a country listed in Country Group E:1 or E:2. 15

22

C.F.R. § 744.22(a). A "military-intelligence end use" is defined as the development, production, or operation of items on the United States Munitions List or in "600 series" or "A018" classifications, and a "military-intelligence end user" is an intelligence or reconnaissance organization of a country's armed services or national guard. Id. § 744.22(f). The directive identifies no such end use, no such end user, and no nexus to any enumerated country, yet it sweeps in every foreign person worldwide, including Legion's Canadian-based engineers. The "is informed" authority in § 744.22(b) is cabined to those same enumerated countries and end users; it does not authorize a blanket, worldwide license requirement. On information and belief, the BIS letter invokes the very subsections—§ 744.22(a) and (f)—that confine the control it purports to exercise.

69.     Moreover, even accepting arguendo that BIS could invoke Section 744.22(b), the regulation reaches only "any item subject to the EAR." 15 C.F.R. § 744.22(b). For the reasons set forth below, inferential text output from a commercially hosted AI model is not an "item" subject to the EAR. The text output delivered to a user in response to a prompt is not "technology," "source code," or any other category of item on the Commerce Control List. BIS cannot subject a non-item to license requirements by declaring it subject to license requirements; the regulation's reach is limited by the definitions Congress and BIS themselves enacted.

70.     The directive's failure to distinguish nationals of close treaty allies from those of adversary nations is not merely a policy failing—it is further evidence that the directive operates outside the statutory framework Congress enacted. The EAR's own architecture limits the reach of "deemed export" controls based on the nationality of the recipient. 15 C.F.R. § 734.20 expressly authorizes releases to nationals of Country Group A:5 countries, including Canada, under circumstances that would require a license for nationals of countries of concern. These nationality-

based distinctions are not optional policy preferences left to agency discretion. They are structural limits built into the regulatory framework that define the outer boundary of what a "deemed export" control may reach. A directive that obliterates these distinctions and sweeps in Legion's Canadian-national engineers — citizens of a Five Eyes intelligence partner, working in Canada, on a tool Legion has a contractual right to access — has overridden the specific limits Congress and BIS imposed on the scope of export-control authority, rather than merely applying that authority in an overbroad manner.

71.    The directive's inconsistency with the President's own contemporaneous Executive Order further confirms that Defendants acted outside any delegated statutory power. On June 2, 2026 — ten days before the directive issued — the President signed an Executive Order entitled "Promoting Advanced Artificial Intelligence Innovation and Security." Section 3(c) of that Order provided, "Nothing in this section shall be construed to authorize the creation of a mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." The directive to Anthropic did precisely what the President's own Executive Order disclaimed authority to do. It imposed a mandatory licensing requirement on the release and distribution of a frontier AI model, effective immediately and enforced under threat of criminal and civil penalties. Where the Executive has publicly disclaimed authority to take the very action it subsequently takes, the inference is compelling that no statute confers the power asserted. For if statutory authority existed, there would have been no need to disclaim it. The Executive Order does not itself create the "clear and mandatory" statutory prohibition that ultra vires require polices. Rather, it is powerful evidence that the statutory authority Defendants now claim simply does not exist.

24

72.     Finally, the pattern of escalating government action against Anthropic over the months preceding the June 12, 2026 Directive demonstrates that the directive cannot be characterized as a genuine exercise of the export-control discretion Congress delegated to BIS. In February 2026, President Trump ordered all federal agencies to cease using Anthropic's technology after the company refused to grant the military unrestricted access to its AI tools, and the Secretary of Defense designated Anthropic a "supply chain risk" — classification typically reserved for companies owned by U.S. adversaries. The President publicly threatened Anthropic with "major civil and criminal consequences" if it did not cooperate. The June 12, 2026 Directive — issued on an emergency basis, without process, and targeting only Anthropic's models while leaving identical capabilities available in competing products — is the culmination of that retaliatory campaign. This context is relevant to the ultra vires analysis not because it invites the Court to "flyspeck" an agency's factual findings, *cf. Changji Esquel Textile*, 40 F.4th at 726, but because it demonstrates that Defendants were not exercising the kind of statutory judgment that Congress delegated. Export-control authority was conferred to prevent adversary nations from obtaining sensitive technology — not to punish American companies for exercising their contractual rights to impose use restrictions on their own products. Where an agency invokes statutory machinery to effectuate a purpose the statute was not enacted to serve, it has acted "in excess of its delegated powers." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958); s*ee WilmerHale*, 784 F. Supp. 3d at 151–52 (finding that the "unsupported assertion of national security will not save" government action that is "on its face, retaliation for the [entity's] protected conduct").

73.     In sum, the June 12, 2026 Directive exceeds Defendants' delegated statutory authority in multiple independent respects: it enforces a control that does not exist on the Commerce Control List; it regulates a transaction that falls outside the statutory and regulatory

definition of an "export" or "deemed export"; it invokes statutory authorities whose express procedural and substantive prerequisites were not satisfied; it overrides the nationality-based limitations Congress built into the EAR's framework; and it deploys export-control machinery to effectuate a purpose unrelated to the statutory objectives Congress enacted ECRA to serve. These are not debatable exercises of delegated judgment but patent departures from "specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile*, 40 F.4th at 722. The directive is therefore entirely in excess of Defendants' delegated powers, ultra vires, and void.

74.     As a result of Defendants' issuance and enforcement of the ultra vires directive, Legion has suffered and continues to suffer irreparable and existential harm – including loss of access to the frontier AI models on which its product is built, disruption of its development and operations, and the prohibition of its Canadian-national engineers from performing their work – and seeks declaratory and injunctive relief vacating the directive, barring its enforcement against Legion and its personnel, and permitting restoration of access, together with costs and attorneys' fees including under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**SECOND CAUSE OF ACTION**
**(Ultra Vires Under IEEPA / Violation of the Berman Informational-Materials Exemption)**
**Against All Defendants**

75.     Legion realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

76.     This cause of action is pleaded in the alternative to the First Cause of Action. The directive issued from the White House on the asserted basis of a "national security threat" and through the kind of emergency posture characteristic of action under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1707. To the extent the directive rests on IEEPA rather than on the ECRA, it exceeds the President's authority under that statute and violates

26

the Berman informational-materials exemption, 50 U.S.C. § 1702(b)(3).

77.    IEEPA does not expressly preclude judicial review of presidential action taken under its authority. No provision of 50 U.S.C. §§ 1701–1707 bars judicial review or strips courts of jurisdiction to assess whether executive action exceeds the statutory authority IEEPA confers. Section 1702(c) provides that, "[i]n any judicial review of a determination made under this section," classified information may be submitted to the reviewing court ex parte and in camera, and adds that "[t]his subsection does not confer or imply any right to judicial review." 50 U.S.C. § 1702(c). That provision is a disclaimer, not a preclusion. It clarifies that § 1702(c) itself is not a source of the right to judicial review, but it does not bar review that is independently available under 28 U.S.C. § 1331, the court's inherent equitable power, or the sovereign-immunity waiver of 5 U.S.C. § 702. Indeed, the first sentence of § 1702(c) expressly contemplates that judicial review will occur by establishing procedures for the handling of classified information in such proceedings — Congress does not prescribe procedures for a form of review it has precluded. Because IEEPA contains no express preclusion of all judicial review, the first requirement for ultra vires review is satisfied, and this Court retains equitable authority to determine whether the directive exceeds the statutory authority IEEPA confers.

78.    There is no alternative procedure for review of the claims raised in this cause of action. To the extent the directive rests on IEEPA authority, it is an exercise of power that 50 U.S.C. §§ 1701 and 1702 confer upon the President — not upon any subordinate agency. The President is not an "agency" within the meaning of the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."). APA review is therefore structurally unavailable to test whether the President exceeded the authority IEEPA confers. Legion does not

27

and cannot assert its APA claim against the Executive Office of the President for this reason. No other statute provides a procedure through which Legion may obtain judicial review of whether presidential action taken under IEEPA's emergency authorities exceeds the limits Congress imposed in §§ 1701 and 1702 — including the Berman Amendment's prohibition on regulation of informational materials, the predicate-finding requirements of § 1701(a), and the scope limitations inherent in IEEPA's grant of authority. IEEPA itself contains no administrative appeal, no petition for reconsideration, and no specialized review mechanism for private parties injured by presidential emergency action. The directive left Legion with no process — administrative or judicial — through which to challenge the President's assertion of IEEPA authority other than this action in equity. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (holding nonstatutory review available where the President is not an "agency" under the APA and no statutory review provision applied); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (construing challenges to presidential action under § 1182(f) as cognizable "outside of the APA").

79.    To the extent the directive rests on IEEPA, it is "entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul.*, 605 U.S. at 681 (internal citations omitted). Unlike the claims in the First Cause of Action, which address whether Defendants exceeded the technical boundaries of export-control authority, the claims below address whether Defendants violated express substantive prohibitions and mandatory prerequisites that Congress built into IEEPA itself. Section 1702(b)(3) categorically excludes informational materials from the President's IEEPA authority. Section 1701(a) conditions the exercise of IEEPA authority on a predicate finding that was never made. These are not debatable exercises of

28

delegated discretion — they are facial violations of "specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile*, 40 F.4th at 722.

80.     The Berman Amendment, 50 U.S.C. § 1702(b)(3), is the "specific prohibition" in IEEPA that the directive violates. Section 1702(b) provides that "[t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly," the importation or exportation of "any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," "regardless of format or medium of transmission." 50 U.S.C. § 1702(b)(3). This is not a discretionary carve-out or a balancing standard — it is an absolute exclusion from the scope of presidential authority. Congress enacted and twice strengthened this prohibition to ensure that IEEPA's emergency powers could not be used to restrict the free flow of information. A directive that regulates or prohibits the delivery of informational materials to Legion and its personnel violates this "clear and mandatory" statutory command.

81.     The expressive outputs that Legion and its personnel receive from the Fable 5 model – drafted text, written legal analysis, summaries, and similar composed material generated in response to user prompts – are informational materials within the meaning of 50 U.S.C. § 1702(b)(3). They are finished expressive content delivered to the recipient, indistinguishable in kind from the publications and other materials Congress placed beyond the reach of IEEPA sanctions. The directive's object and effect are to stop the flow of that expressive material to its recipients.

82.     The directive prohibits Legion and its foreign-national personnel from accessing and receiving these informational materials by commanding their provider to suspend all access.

This is precisely the type of indirect regulation of informational materials that the Berman Amendment forbids.

83.    The model outputs are fully formed and exist as expressive material at the moment they are delivered to the user in response to a prompt. The directive does not regulate a service to create, produce, market, or enhance materials not yet in existence; it regulates the delivery and receipt of the expressive materials themselves, regardless of the format or medium of their transmission. Although the directive operates by commanding a provider to suspend a service, its purpose and effect are to stop the flow of those expressive materials to Legion and other recipients, not merely to burden expression incidentally while regulating an unrelated commercial transaction.

84.    To the extent the directive purports to rest on IEEPA's grant of emergency authority, it is independently ultra vires because the mandatory statutory prerequisites for exercising IEEPA authority have not been satisfied. Section 1701(a) provides that presidential authority under § 1702 "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Section 1701(b) further provides that IEEPA authorities "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b) (emphasis added). No national emergency has been declared with respect to the availability of a commercially hosted AI model's code-analysis capability — the sole basis asserted for the directive. Nor could the statutory predicate be satisfied here. The purported threat, a jailbreak of a U.S. company's AI model, hosted in the United States, developed by a U.S. company, and available through a U.S. commercial platform, does not have its "source

in whole or substantial part outside the United States." A statutory prerequisite that conditions the exercise of presidential authority on a specific finding is "clear and mandatory" within the meaning of the ultra vires standard, and the absence of the required finding renders the directive void. *See Changji Esquel Textile*, 40 F.4th at 722.

85.    Even setting aside the Berman Amendment's absolute prohibition and the absence of the § 1701(a) predicate, the directive exceeds IEEPA authority for an additional reason. It asserts authority of vast economic and political significance that IEEPA does not clearly and explicitly confer. The directive suspends public access to a commercial AI service relied upon by hundreds of millions of users and integral to an emerging industry — and Defendants' own statements reveal that they claim not a narrow emergency power but ongoing executive dominion over whether frontier AI models may reach the public at all. Neither IEEPA nor any other statute clearly and explicitly authorizes the Executive to suspend access to a lawful commercial information service on this basis. Under the major questions doctrine, an assertion of authority of this magnitude requires clear congressional authorization. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022). The absence of such authorization is further evidence that the directive exceeds the "delegated powers" IEEPA confers — it is not a debatable exercise of emergency authority but a claim of power Congress never granted.

86.    Defendants' own description of their action confirms its magnitude. According to public reporting, an administration official stated that models at or above the capability of Mythos "would need to go through the administration," and a person familiar with the Government's thinking described the result as a "de-facto licensing regime." A claimed authority to require frontier AI models to obtain Executive approval before reaching the public is precisely the kind of

31

decision of vast economic and political significance that demands clear congressional authorization, which is absent here.

87.    The major questions doctrine applies with particular force here because the administration's own conduct reveals the scope of the authority it claims. According to public reporting, an administration official stated that models at or above the capability of Mythos "would need to go through the administration," and a person familiar with the Government's thinking described the resulting regime as ensuring that "companies will not screw with the White House." At the G-7 summit on June 18, 2026, Commerce Secretary Lutnick presided over discussions with AI executives regarding the restoration of access to Anthropic's models — discussions that, by their nature, confirmed the existence of a de facto executive licensing regime for frontier artificial intelligence. French President Macron publicly stated: "We won't buy any models made by these companies if overnight, you can just flip the switch" — a recognition that the United States has asserted the unilateral power to disable a globally relied-upon commercial information service at will. This is not the exercise of a narrow emergency power; it is the assertion of ongoing executive dominion over an entire sector of the economy. Neither IEEPA nor any other statute clearly authorizes that dominion, and under the major questions doctrine, such authority cannot be implied from statutory silence.

88.    The assertion is the more extraordinary because the President's own June 2, 2026 Executive Order contemplated a "voluntary framework" for evaluating frontier AI models — not a mandatory preclearance regime — and expressly disclaimed authority to impose "a mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." The directive, issued ten days later, is irreconcilable with that disclaimer. Where the Executive has publicly disavowed the

32

very power it then exercises, the inference that the power exceeds any statutory grant is compelling.

89.     The directive's overbreadth independently confirms its unlawfulness under IEEPA: by barring "any foreign national" worldwide – including Legion's Canadian-national engineers – it sweeps in conduct posing no conceivable national-security risk.

90.     The directive's overbreadth is underscored by the contrast between its global reach and the narrow, targeted mechanisms available under both IEEPA and the EAR. IEEPA authorizes the President to act against threats "which [have their] source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). This language limits both the type of threat (unusual and extraordinary) and its origin (foreign-sourced). The directive obliterates these statutory boundaries by barring "any foreign national" worldwide — including Legion's Canadian-national engineers, citizens of a Five Eyes intelligence partner, working in Canada, on a tool Legion has a contractual right to use — without any individualized finding of foreign-sourced risk. IEEPA does not authorize the categorical denial of an information service to every non-citizen on Earth. Where a directive reaches conduct that bears no connection to any foreign-sourced threat, it has exceeded the statutory scope of the emergency power Congress conferred.

91.     In sum, the directive, to the extent it rests on IEEPA, exceeds the President's delegated authority in multiple independent respects: it regulates informational materials in violation of the absolute prohibition in § 1702(b)(3); it was issued without the national-emergency declaration and predicate finding that § 1701(a) and § 1701(b) require as mandatory conditions for the exercise of IEEPA authority; it asserts authority of vast economic and political significance — a de facto licensing regime for frontier artificial intelligence — that IEEPA does not clearly and explicitly confer; and its blanket, worldwide reach sweeps in conduct that bears no relationship to

33

any foreign-sourced threat, overriding the structural limitations inherent in IEEPA's design. These are not debatable exercises of emergency presidential authority but patent violations of "specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile*, 40 F.4th at 722. The directive is therefore entirely in excess of the authority IEEPA confers, ultra vires, and void. This Court has jurisdiction to review whether the directive exceeds the authority IEEPA confers, pursuant to the court's inherent equitable power, 28 U.S.C. § 1331, and the sovereign-immunity waiver of 5 U.S.C. § 702.

92.     As a result of Defendants' ultra vires directive and violation of the Berman informational-materials exemption, Legion seeks equitable relief in the form of a declaratory judgment that the directive exceeds IEEPA authority and violates 50 U.S.C. § 1702(b)(3), an order vacating and setting aside the directive, preliminary and permanent injunctive relief barring its enforcement against Legion and its personnel and permitting restoration of access to the Fable 5 model, and an award of costs and attorneys' fees including under the Equal Access to Justice Act.

## THIRD CAUSE OF ACTION
### (APA - Arbitrary and Capricious Agency Action)
### Against All Defendants Except the Executive Office of the President

93.     Legion realleges and incorporates by reference the factual allegations set forth in the preceding paragraphs as if fully set forth herein.

94.     The APA, 5 U.S.C. § 706(2)(A), requires a reviewing court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

95.     The June 12, 2026 Directive is final agency action. It marks the consummation of Defendants' decision-making process rather than a tentative, interlocutory, advisory, or informational step, and it determines rights and obligations and produces direct legal

34

consequences. By its terms, the directive required the immediate suspension of all foreign-national access to the Fable 5 and Mythos 5 models, and it is being enforced against Legion and its personnel. No further administrative step is available to Legion or required before the directive's effects take hold.

96.    Further, the directive is the operative agency command that required Anthropic to terminate access immediately, exposed Anthropic to enforcement consequences if it failed to comply, and left Legion and its personnel with no administrative process through which to obtain an exemption, license, reconsideration, or stay before access was cut off. The directive therefore altered the legal regime governing Anthropic, Legion, and Legion's foreign-national personnel, and legal consequences flowed directly from the directive itself.

97.    Commerce and BIS adopted, issued, implemented, or enforced the June 12, 2026 directive as their own operative export-control determination. To the extent the White House participated in, requested, approved, or directed the decision, Commerce and BIS made the directive operative through agency authority and export-control enforcement mechanisms administered by Commerce and BIS.

98.    The APA claim asserted in this Count is not precluded by 50 U.S.C. § 4821(a). Section 4821(a) withdraws APA review only of BIS's exercise of its "control-list functions" — i.e., decisions to classify or not classify particular items on the Commerce Control List. The June 12, 2026 Directive is not a control-list classification decision. It is a directive ordering the immediate suspension of a lawful commercial service and is reviewable as an enforcement action distinct from a classification determination. Even if the directive invokes control-list authority, the claim that the directive lacks a rational connection between its stated justification and the remedy selected does not challenge BIS's classification judgment but rather the reasonableness of the

enforcement mechanism employed. APA review of the reasoned decision-making component of agency action remains available even where narrow aspects of that action implicate classification authority.

99.     The June 12, 2026 Directive is not "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). The § 701(a)(2) exception is "narrow" and applies only where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). ECRA provides meaningful standards that constrain BIS's exercise of export-control authority. It requires that controls be based on specific statutory criteria including the potential end users and "end-uses" of items, 50 U.S.C. § 4813(a). It mandates that BIS identify controlled items through established procedures including interagency review and notice-and-comment, § 4817(a)(2), and it imposes structural limits on what constitutes a controlled "export" or "deemed export," 15 C.F.R. § 734.13. These are judicially manageable standards sufficient to review whether BIS's action was arbitrary and capricious.

100.    The strong presumption of reviewability applies with particular force here. It would be "an extreme position" to offer no recourse for agency action taken outside the bounds of the agency's statutory grant. *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 680 (1986). The government bears a "heavy burden" in overcoming this presumption, and nothing in ECRA's text, structure, or history suggests that Congress intended to insulate arbitrary enforcement actions from all forms of judicial scrutiny.

101.    To the extent the June 12, 2026 Directive is reviewable under the APA – including as the reasoned-decision making component of Legion's ultra vires claims – the directive is arbitrary and capricious because Defendants failed to examine the relevant data, failed to consider

important aspects of the problem, failed to articulate a rational connection between the facts found and the choice made, and adopted a measure that is internally inconsistent with the rationale Defendants invoked.

102.   Specifically, the directive lacks a rational connection between the asserted threat and the remedy selected. Defendants identified a narrow "jailbreak" that allegedly allowed a user to prompt a model to review software code and identify flaws, but Defendants responded by imposing a categorical worldwide suspension of access to Fable 5 and Mythos 5 by any foreign national, regardless of nationality, location, employer, use case, purpose, or relationship to any adversary jurisdiction.

103.   The directive is materially underinclusive relative to its stated rationale. Defendants restricted only Fable 5 and Mythos 5 while leaving equivalent or materially similar code-analysis capabilities available through competing models, including OpenAI's GPT-5.5. Defendants did not explain why the same asserted capability was a national-security threat when supplied by Anthropic but not when supplied by other providers.

104.   Defendants also failed to consider obvious less-restrictive alternatives to a global suspension, including restricting access only for nationals of adversary nations, imposing use-case limitations, or requiring enhanced screening – any of which would have addressed the stated concern without terminating access for all users worldwide. Defendants did not explain why any the available narrower measures would have been insufficient to address the asserted concern. Nor did Defendants explain why the alleged risk required a categorical ban applicable to all foreign nationals worldwide, including Legion's Canadian-national engineers, rather than a measure tailored to the risk that Defendants claimed to have identified.

105. The directive is fatally overbroad because it bars "any foreign national" without distinguishing nationals of close treaty allies from nationals of adversary nations. Defendants' own regulations recognize this distinction: 15 C.F.R. § 734.20 authorizes releases to bona fide employees who are nationals of Country Group A:5 countries, which includes Canada.

106. Defendants failed to consider the reliance interests of commercial customers who had lawful contractual access to, and had integrated, the Fable 5 and Mythos 5 models into their products and operations, including Legion, which had a contractual right to access and use the Fable 5 model and had integrated it into its development and operations, before the directive issued without prior notice, supporting evidence, or any opportunity to be heard.

107. Defendants also failed to exercise their own reasoned judgment. On information and belief, the directive was precipitated not by any neutral agency assessment but by a report and telephone calls from private companies – including Amazon and at least five other companies – to senior administration officials over a single evening and the following morning. Defendants conducted no disclosed independent analysis, disclosed no supporting evidence, and afforded no opportunity to respond before issuing a ninety-minute ultimatum and the directive.

108. An independent security researcher who reviewed the same report concluded that Anthropic's response was out of line with the report. Anthropic explained in its press releases that the cited capability was simple, available in other models, and reflected the model's intended defensive use.

109. An agency may consider information supplied by private parties, but it may not adopt the conclusions of interested private actors without independent evaluation and without explaining why the evidence supports the agency's chosen remedy. Defendants' unexplained

adoption of undisclosed private submissions, followed by an immediate and categorical shutdown of access to a single company's models, is not reasoned decision making.

110.    On information and belief, the directive also bears the hallmarks of pretext. Legion alleges the following matters on information and belief, as the basis for inquiry beyond the rationale Defendants have stated; these matters are not part of any administrative record Defendants have disclosed.

111.    First, on information and belief, the directive's chosen means cannot achieve its stated end. The directive suspends only the Fable 5 and Mythos 5 models, yet the same code-analysis capability the Government invoked as the basis for the directive remains publicly available in competing products – including OpenAI's GPT-5.5, which the directive did not restrict. Suspending Fable 5 and Mythos 5 thus does nothing to prevent access to the very capability the Government cited, demonstrating that the stated national-security rationale is irrational on its own terms and runs counter to the evidence.

112.    Second, on information and belief, this is not the first time the Government has invoked a national-security label against the same company whose models the directive targets. Approximately ninety days before the directive, a court in the Northern District of California found that the Government's designation of Anthropic as a supply-chain risk under a national-security rationale was likely pretextual and that the Government's real motive was unlawful retaliation.

113.    Third, on information and belief, the Cabinet officer responsible for Commerce and BIS is the subject of a pending request by Members of Congress that Commerce's Inspector General examine whether his family's financial interests in the AI industry improperly bear on his official decisions affecting that industry. Legion alleges the existence of that congressional request, but does not allege that the Inspector General has made any finding or that any such conflict in

fact caused the directive. Taken together, however, these circumstances constitute a strong showing of bad faith or improper behavior sufficient to warrant looking behind the directive's stated rationale, and they support the inference that the asserted national-security justification is contrived rather than genuine.

114. Fourth, on information and belief, the sequence of events supports the inference of pretext. The directive followed within hours of outreach by Anthropic's commercial rivals and counterparties, issued without any disclosed risk assessment, and singled out the two models of a single company while leaving similar capabilities available in competing products. According to public reporting, an administration official acknowledged that the Government does not regard competing models as national-security threats, and described a regime in which any model at or above the capability of Mythos "would need to go through the administration" – a de-facto licensing regime that a person familiar with the Government's thinking described as ensuring that "companies will not screw with the White House."

115. The directive is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

116. This Court must exercise its independent judgment in determining whether Defendants acted within their statutory authority in issuing the June 12, 2026 Directive. Defendants' action is "not in accordance with law" within the meaning of § 706(2)(A) because it exceeds the statutory boundaries of export-control authority — no operative control-list classification reaches the conduct regulated, and the directive employs mechanisms (§ 4817(b)(1) interim controls and § 744.22(b) "is informed" letters) whose express statutory and regulatory prerequisites were not satisfied. The directive is therefore not only arbitrary and capricious but also "not in accordance with law" as an independent ground for vacatur under § 706(2)(A).

117.    The directive is further unlawful under § 706(2)(C) as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and under § 706(2)(D) as issued "without observance of procedure required by law." The interim-control authority of § 4817(b)(1) requires identification of technologies through an interagency process that "shall include a notice and comment period," 50 U.S.C. § 4817(a)(2)(C), and the "is informed" authority under § 744.22(b) is limited by its terms to specific military-intelligence end uses and end users and to enumerated countries. Defendants observed none of these mandatory procedures.

118.    As a result of Defendants' arbitrary and capricious agency action, Legion has suffered and continues to suffer the irreparable and existential harm alleged above. Legion seeks equitable relief in the form of a declaration that the directive is unlawful, an order vacating and setting aside the directive under 5 U.S.C. § 706(2)(A), an order under 5 U.S.C. § 705 staying or postponing the effective date of the directive pending judicial review and preliminary and permanent injunctive relief barring its enforcement against Legion and its personnel.

119.    Legion is entitled to a stay of the directive's effective date under 5 U.S.C. § 705 pending judicial review. The factors governing issuance of a § 705 stay — (1) substantial likelihood of success on the merits, (2) irreparable injury absent a stay, (3) no substantial injury to other interested parties, and (4) the public interest — each favor Legion. Legion has a substantial likelihood of success for the reasons alleged herein. Legion will suffer irreparable and existential harm absent a stay because each day the directive remains in force disrupts its operations, sidelines its engineers, and erodes its competitive position in a field defined by continuous access to the most capable models — losses that cannot be recovered after the fact. A stay would not injure other interested parties; the stated national-security concern is pretextual and the same capability remains available in competing products. The public interest favors a stay because the directive

41

asserts an unchecked executive power to disable commercial information services at will, chilling innovation and undermining the legitimate reliance interests of American companies and their personnel.

## PRAYER FOR RELIEF

WHEREFORE, Legion prays for judgment against Defendants, and each of them, as follows:

1.      For a declaratory judgment pursuant to 28 U.S.C. § 2201 that the June 12, 2026 Directive is unlawful, in excess of statutory authority, arbitrary and capricious, and is therefore void and of no legal effect;

2.      For an order vacating and setting aside the June 12, 2026 Directive in its entirety;

3.      For preliminary injunctive relief restraining Defendants from enforcing, implementing, maintaining, or giving effect to the June 12, 2026 Directive and preserving the status quo during the pendency of this action or in the alternative, against Legion, its employees, contractors, personnel, agents, accounts, and commercial access to Anthropic, PBC's Fable 5 model during the pendency of this action;

4.      For permanent injunctive relief restraining Defendants, their officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with them from enforcing, implementing, maintaining, or giving effect to the June 12, 2026 Directive or in the alternative, against Legion, its employees, contractors, personnel, agents, accounts, and commercial access to Anthropic, PBC's Fable 5 model;

5.      To the extent the directive is reviewable under the APA, for an order under 5 U.S.C. § 705 staying the effective date of the directive and preserving Legion's access to the Fable 5 model pending the conclusion of judicial review;

6.     For costs of suit incurred herein;

7.     For reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

8.     For such other and further relief as the Court deems just and proper.

Dated: June 23, 2026          Respectfully submitted,

By: */s/ Diana Lyn Curtis Shutzer*
Diana Lyn Curtis Shutzer (DC Bar No. 1670689)
Gregory L. Ewing (DC Bar No. 484684)
Nicholas T. Solosky (DC Bar No. 1012916) (*pro hac forthcoming*)
**SPENCER FANE LLP**
1233 Twentieth St NW, Suite 600
Washington, DC 20036
dshutzer@spencerfane.com
gewing@spencerfane.com
nsolosky@spencerfane.com
Tel: (202) 293-0444

Jeffrey Ratinoff (*pro hac* forthcoming)
**SPENCER FANE LLP**
225 West Santa Clara Street, Suite 1500
San Jose, CA 95113
jratinoff@spencerfane.com
Tel: (408) 286-5100

*Attorneys for Plaintiff*