**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

LEGION LEGALTECH, CORP.,

    Plaintiff,

  v.

UNITED STATES OF AMERICA, *et al.*,

    Defendants.

Case No.  1:26-cv-2225

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................... 3

II.     STATEMENT OF FACTS ..............................................................................5

    A.      Legion's Business and Its Reliance on the Fable 5 Model ...........................5

    B.      The June 12, 2026 Directive ........................................................................6

    C.      Anthropic's Public Dispute of the Directive's Basis, and the Continued
        Availability of the Same Capability Elsewhere ...........................................7

    D.      The Regulatory Landscape: No Operative Rule Controls Hosted AI Model
        Access .........................................................................................................7

    E.      The Directive's Retaliatory Backdrop and Its Conflict with the President's
        Own Executive Order ...................................................................................8

    F.      Irreparable and Existential Harm to Legion..................................................8

III.    LEGAL STANDARD.......................................................................................9

    A.      Likelihood of Success on the Merits.............................................................9

    B.      Irreparable Harm........................................................................................ 10

    C.      Balance of the Equities .............................................................................. 11

    D.      Public Interest ........................................................................................... 11

IV.     ARGUMENT ................................................................................................. 12

    A.      Legion Is Likely to Succeed on the Merits Because the Directive Exceeds
        Every Asserted Source of Legal Authority.................................................. 12

        1.      The Court Has Jurisdiction To Review The June 12, 2026 Directive ................. 12

        2.      The Directive Is Ultra Vires Because It Exceeds the Export-Control
            Authority Congress Conferred ................................................................. 13

        3.      In the Alternative, the Directive Violates IEEPA and the Berman
            Informational-Materials Exemption.......................................................... 16

        4.      The Directive Is Arbitrary and Capricious Under the APA................................. 18

    B.      Legion Will Suffer Irreparable Harm Absent Injunctive Relief ................................ 20

    C.      The Balance of Equities and the Public Interest Overwhelmingly Favor
        Legion ....................................................................................................... 22

    D.      The Bond Should Be Nominal or Waived ................................................... 23

V.      CONCLUSION.............................................................................................. 23

## I.    INTRODUCTION

Plaintiff Legion LegalTech, Corp. ("Legion") respectfully moves under Federal Rule of Civil Procedure 65(a) for a preliminary injunction restraining Defendants – the United States, the Department of Commerce, the Bureau of Industry and Security ("BIS"), the Secretary of Commerce, and the Under Secretary of Commerce for Industry and Security – from enforcing the June 12, 2026 export-control directive (the "June 12, 2026 Directive") that terminated Legion's access to Anthropic, PBC's ("Anthropic") Fable 5 artificial-intelligence model, and directing that all steps necessary to restore Legion's access to that model be taken during the pendency of this action.

Public reporting indicates that, on June 12, 2026, BIS sent Anthropic's chief executive a so-called "is informed" letter ordering Anthropic to suspend all access to its Fable 5 and Mythos 5 models by "any foreign national, whether inside or outside the United States, including foreign-national Anthropic employees." (Compl. ¶¶ 33, 35; Rothrock Decl. ¶ 16.[1]) The stated basis was a narrow "jailbreak" that enabled the model to read a software codebase and identify flaws. According to Anthropic, the same capability "is widely available from other models (including OpenAI's GPT-5.5)," adding that it disagreed "that the finding of a narrow potential jailbreak should be cause for recalling a commercial model deployed to hundreds of millions of people." (Rothrock Decl. ¶ 17, Ex. B; RJN Ex. 1.[2]) To comply, Anthropic disabled both models for all users worldwide, abruptly cutting off Legion – an AI-native litigation-technology company that had licensed Fable 5 and built it into the core of its product development. (Rothrock Decl. ¶¶ 10-11, 17.)

---

[1]    The Declaration Of Arthur E. Rothrock In Support Of Plaintiff's Motion For A Preliminary Injunction ("Rothrock Decl.") is filed concurrently herewith.

[2]    The Request For Judicial Notice In Support Of Plaintiff's Motion For A Preliminary Injunction ("RJN") is filed concurrently herewith.

Legion is likely to succeed on the merits because the directive exceeds every source of authority the Government could invoke. First, it is *ultra vires* under the Export Control Reform Act ("ECRA") and the Export Administration Regulations ("EAR"). Providing a user access to a hosted model that accepts text prompts and returns text outputs is not an "export" or "deemed export" of "technology" or "source code" – categories that the EAR defines to exclude "object code" and that require the actual release of the controlled information to a foreign national. 15 C.F.R. §§ 734.13, 734.15. The only classification that ever directly controlled AI model weights – Export Control Classification Number ("ECCN") 4E091 – was rescinded in May 2025 with no replacement, so there is no operative control-list classification to enforce.

The two statutory hooks the letter invokes – 50 U.S.C. § 4817(b)(1) and 15 C.F.R. § 744.22(b) – are patent misconstructions: the first reaches only "technology identified pursuant to" a notice-and-comment process that never occurred, and the second is a targeted tool confined to "military-intelligence" end users in a handful of enumerated adversary countries, not a worldwide ban.

Second, to the extent the directive rests on the International Emergency Economic Powers Act ("IEEPA"), it violates the Berman Amendment's absolute exclusion of "informational materials," 50 U.S.C. § 1702(b)(3), and lacks the national-emergency predicate § 1701(a) requires.

Third, the directive is arbitrary and capricious: it bears no rational connection to its stated rationale, is materially underinclusive, ignored obvious less-restrictive alternatives and serious reliance interests, and bears the hallmarks of pretext.

Legion's harm is irreparable and existential. For an AI-native company, continuous access to the most capable frontier model is the foundation of the product and of the ability to compete; frontier capability advances on a timescale of weeks, and competitive ground lost during a

suspension cannot be regained. (Rothrock Decl. ¶¶ 21-24.) Because Legion's claims sound against the federal sovereign, its losses are unrecoverable as monetary damages and are therefore irreparable as a matter of law.

The balance of equities and the public interest, which merge here, tip decisively in Legion's favor: the Government has no legitimate interest in enforcing an *ultra vires* directive, and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations omitted). The Court should grant the injunction and set bond at a nominal amount or waive it.

## II.    STATEMENT OF FACTS

### A.    Legion's Business and Its Reliance on the Fable 5 Model

Legion is an AI-native litigation-technology company that builds drafting and case-management tools for attorneys on top of frontier artificial-intelligence models; its products and operations depend on continuous access to the most capable commercially available models. (Compl. ¶¶ 26-29; Rothrock Decl. ¶¶ 7, 21-22.)

Legion is a commercial customer of Anthropic through the Anthropic API under Anthropic's Commercial Terms of Service and a Zero Data Retention arrangement, and under that agreement it had a contractual right and license to access and use Anthropic's Fable 5 model. (Compl. ¶¶ 27-28; Rothrock Decl. ¶ 10, Ex. A.) Before the directive issued, Legion's software engineers were using Fable 5 in active development, and an additional engineer joining at the end of June 2026 was slated to use it, and Legion's founder personally used the model both for software development and to evaluate its fitness for Legion's litigation-drafting work, incurring approximately $2,500 in overage charges for Fable 5 usage alone in a matter of days. (Rothrock Decl. ¶ 11.)

Legion's software engineers work remotely from Canada – a Five Eyes intelligence partner of the United States and a Country Group A:5 nation under the EAR. (Compl. ¶¶ 29, 70; Rothrock Decl. ¶ 18.) The June 12, 2026 Directive bars them from a tool Legion lawfully licenses, even though the AI and its output are not covered by the statutory regime.  And even if they were, the Government's own deemed-export framework authorizes releases of controlled technology and source code to bona fide employees who are nationals of Country Group A:5 countries such as Canada – including Legion's Canadian-national engineers – without an individual license. 15 C.F.R. § 734.20(b); Rothrock Decl. ¶ 18.

### B.     The June 12, 2026 Directive

According to Anthropic's press release, on June 12, 2026, BIS sent Anthropic's chief executive an "is informed" letter, on the authority of the Department of Commerce, ordering Anthropic to suspend all access to its Fable 5 and Mythos 5 models by "any foreign national, whether inside or outside the United States, including foreign-national Anthropic employees." (Compl. ¶¶ 33, 35.) The June 12, 2026 Directive issued without prior notice to Legion or any other affected customer, without disclosure of the evidence on which it was based, and without any hearing or opportunity to be heard before the deprivation took effect. (Compl. ¶ 37.) It drew no distinction between nationals of adversary nations and nationals of close treaty allies such as Canada; it imposed a blanket, worldwide bar on access by "any foreign national" without exception. (Compl. ¶ 38.)

To comply, Anthropic disabled Fable 5 and Mythos 5 for all users worldwide – not only foreign nationals – abruptly terminating Legion's access. (Compl. ¶ 39; Rothrock Decl. ¶ 17.) Anthropic's suspension was compelled by, and is the direct and foreseeable result of, the June 12, 2026 Directive; Anthropic took no independent action to restrict Legion's access. (Compl. ¶¶ 39, 56; Rothrock Decl. ¶ 17.)

**C.     Anthropic's Public Dispute of the Directive's Basis, and the Continued Availability of the Same Capability Elsewhere**

Anthropic publicly disputed the factual premise of the directive, stating that the very code-analysis capability the Government invoked "is widely available from other models (including OpenAI's GPT-5.5)" and that it disagreed "that the finding of a narrow potential jailbreak should be cause for recalling a commercial model deployed to hundreds of millions of people." (Compl. ¶ 41; Rothrock Decl. ¶ 17, Ex. B; RJN Ex. 1.) An independent security researcher who reviewed the same report stated that the Government's response "seems way out of line with what's actually in the research report." (Compl. ¶ 42; RJN Ex. 5.) Access to all other Anthropic models was unaffected; only Fable 5 and Mythos 5 were suspended. (Compl. ¶ 43.)

**D.     The Regulatory Landscape: No Operative Rule Controls Hosted AI Model Access**

The EAR's deemed-export framework controls the release of "technology" or "source code" – expressly excluding "object code" – to a foreign national, and requires that the controlled information itself be made available to the recipient. 15 C.F.R. §§ 734.13, 734.15. The Fable 5 and Mythos 5 models reside on servers in the United States; when a user accesses them, the models process a text prompt and return a text output, and the models' weights, source code, and underlying technical know-how are never transmitted to or made accessible to the user. (Compl. ¶¶ 31, 63.) The only export-control rule that ever directly controlled AI model weights – ECCN 4E091, promulgated under the January 2025 "AI Diffusion Rule" – was rescinded on May 13, 2025, with no replacement, and no currently operative ECCN classifies hosted AI model access as a controlled export. (Compl. ¶ 61.)

### E. The Directive's Retaliatory Backdrop and Its Conflict with the President's Own Executive Order

The June 12, 2026 Directive did not emerge in isolation. In February 2026, after Anthropic refused to grant the Department of Defense unrestricted access to its tools, the President publicly ordered all federal agencies to stop using Anthropic's technology, the Secretary of Defense designated Anthropic a "supply chain risk," and the President threatened Anthropic with "major civil and criminal consequences." (Compl. ¶ 45; RJN Ex. 2.) On information and belief, the June 12, 2026 Directive was precipitated not by any neutral agency assessment but by a report and telephone calls from Anthropic's commercial rivals – including Amazon, Anthropic's largest investor and cloud host – over a single evening and the following morning. (Compl. ¶ 32; RJN Ex. 5.) Ten days before the June 12, 2026 Directive, on June 2, 2026, the President signed an Executive Order, "Promoting Advanced Artificial Intelligence Innovation and Security," whose Section 3(c) expressly disclaimed authority to create "a mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." (Compl. ¶¶ 47, 71.) The directive imposed precisely such a requirement.

### F. Irreparable and Existential Harm to Legion

The June 12, 2026 Directive's immediate effect was to terminate Legion's access to the Fable 5 model at the center of its product development, forcing Legion off the model in the middle of several active, complex development projects and barring its Canada-based engineers from the work for which they were engaged. (Rothrock Decl. ¶¶ 18, 20.) With Fable 5, Legion completed full-stack feature build-outs in days that prior-generation models could not have produced in that timeframe without significant rework. As a result, Legion lost development velocity that compounds for as long as the directive remains in force. (Rothrock Decl. ¶¶ 13, 22.) Lost velocity

is not trivial.  Frontier AI capabilities advance on a compressed timescale of weeks so that a multi-week deprivation operates as a permanent, un-remediable market exclusion that will destroy Legion's competitive position before a trial on the merits can ever occur. (Rothrock Decl. ¶ 21.) And therefore, because Legion's claims sound against the federal sovereign, its economic losses are unrecoverable as money damages. (Rothrock Decl. ¶ 24.)

## III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Taylor v. Trump*, 823 F.Supp.3d 17, 26 (D.D.C. 2026). To obtain such relief, Legion must establish four elements: (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Taylor v. Trump*, 823 F.Supp.3d 17, 29 (D.D.C. 2026); *Holmes v. FEC*, 71 F.Supp.3d 178, 183 (D.D.C. 2014); *Zaid v. Exec. Office of the President*, 815 F.Supp.3d 113, 133 (D.D.C. 2025). The movant bears the burden of making a "clear showing" that it is entitled to relief on each factor. *Holmes*, 71 F.Supp.3d at 183; *Zaid*, 815 F.Supp.3d at 127.

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Holmes*, 71 F.Supp.3d at 183; *Aamer*, 742 F.3d at 1038 (the primary purpose of a preliminary injunction is "to preserve the status quo, i.e., to preserve the object of the controversy in its then existing condition").

### A.    Likelihood of Success on the Merits

The likelihood of success on the merits is the "most critical" of the four preliminary-injunction factors. *Taylor*, 823 F.Supp.3d at 40-41. A plaintiff seeking to demonstrate this factor

must first show that it is likely to clear all applicable jurisdictional hurdles. *Taylor*, 823 F.Supp.3d at 26-27.

Once jurisdiction is established, the movant must demonstrate a substantial likelihood that it will prevail on at least one of its claims on the merits. As this Court has recognized, when a plaintiff challenges action by the Executive Branch as taken outside the bounds of any statutory authorization, a strong showing that the challenged action is ultra vires – i.e., that no statute confers the asserted power – satisfies this factor. *Zaid*, 815 F.Supp.3d at 134–35; *see also Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, 784 F. Supp. 3d 127, 151 (D.D.C. 2025) (finding executive action that was "on its face, retaliation for [] protected conduct" likely unlawful).

### B.      Irreparable Harm

The irreparable harm element requires the movant to demonstrate "a threat of substantial and immediate irreparable injury" – harm that is "beyond remediation." *Taylor*, 823 F.Supp.3d at 39. A prospective violation of legal rights that cannot be compensated in damages satisfies this standard. *Taylor*, 823 F.Supp.3d at 40.

The D.C. Circuit and this Court have consistently held that where a plaintiff's claims lie against the federal government and its economic losses are therefore unrecoverable as monetary damages, equitable relief is the only adequate remedy and the injury is, by that measure, irreparable. *See* 5 U.S.C. § 702; *Zaid*, 815 F.Supp.3d at 137. Additionally, in this Circuit it remains an open question whether the "likelihood of success" factor is "an independent, free-standing requirement," or whether, "in cases where the other three factors strongly favor issuing an injunction," the plaintiff need only raise serious and substantial questions going to the merits. *Aamer*, 742 F.3d at 1043.

Where constitutional or statutory harms form the basis for irreparable harm, the likelihood of success on the merits and the irreparable harm inquiries "overlap heavily." *Taylor*, 823 F.Supp.3d at 40. There is, however, no per se rule that a mere allegation of statutory or constitutional violation automatically constitutes irreparable harm; the movant must still demonstrate an actual and imminent threat of the injury claimed. *Id.*

### C.    Balance of the Equities

The third factor requires the Court to balance the harm that would befall the movant absent injunctive relief against the harm an injunction would impose on the opposing party. *Holmes*, 71 F.Supp.3d at 188; *Aamer*, 742 F.3d at 1043. When the opposing party is the government, this factor merges with the public-interest inquiry. *Taylor*, 823 F.Supp.3d at 36 ("When considering a request for a preliminary injunction, the balance-of-equities and the public-interest factors merge when the government is the opposing party.").

In conducting this weighing, the Court must consider whether the harm the movant faces in the absence of relief is concrete, ongoing, and irreversible – and whether the government would suffer any cognizable countervailing prejudice from maintaining the status quo while the case is litigated on the merits. *Aamer*, 742 F.3d at 1044.

### D.    Public Interest

The public interest factor asks whether granting the preliminary injunction would serve, or at least not disserve, the broader public. *Holmes*, 71 F.Supp.3d at 188; *Zaid*, 815 F.Supp.3d at 135. This Circuit has recognized that the "perpetuation of unlawful agency action does not serve the public interest." *Taylor*, 823 F.Supp.3d at 36. Accordingly, when the challenged government action exceeds statutory authority, or reflects arbitrary and capricious decision making untethered from the agency's statutory mandate, a preliminary injunction restraining that action serves – rather than undermines – the public interest. *Id.*; *Zaid*, 815 F.Supp.3d at 138.

11

As discussed below, all four factors favor the issuance of a preliminary injunction here.

IV.    ARGUMENT

A.    **Legion Is Likely to Succeed on the Merits Because the Directive Exceeds Every Asserted Source of Legal Authority**

1.    **The Court Has Jurisdiction To Review The June 12, 2026 Directive**

The decision is subject to judicial review, which is not precluded by the statute. ECRA precludes review under the Administrative Procedure Act ("APA") of BIS's control-list functions, 50 U.S.C. § 4821(a). "Control-list functions" are decisions to classify or not classify particular items on the Commerce Control List. The June 12, 2026 Directive is not a control-list classification decision. It is a directive ordering the immediate suspension of a lawful commercial service and is reviewable as an enforcement action distinct from a classification determination. Even if the directive invokes control-list authority, the claim that the directive lacks a rational connection between its stated justification and the remedy selected does not challenge BIS's classification judgment but rather the reasonableness of the enforcement mechanism employed. APA review of the reasoned decision-making component of agency action remains available even where narrow aspects of that action implicate classification authority.

Moreover, section 4821(a) does not preclude all judicial review. The D.C. Circuit has squarely held that section 4821(a) "says nothing about judicial review in general" and therefore does not foreclose nonstatutory ultra vires review of agency action taken in excess of statutory authority. *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (holding that nonstatutory ultra vires review survived ECRA's preclusion of APA review because § 4821(a) "does not expressly preclude all judicial review"); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721-22 (D.C. Cir. 2022) (applying ultra vires review to ECRA challenge after finding APA review barred under § 4821(a)). Such nonstatutory review is

12

preserved by the sovereign-immunity waiver of 5 U.S.C. § 702 and the equity power of the federal courts. *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996); *Dart v. United States*, 848 F.2d 217, 222-24 (D.C. Cir. 1988) (export-control finality clause does not bar review of action beyond the Secretary's statutory "functions"); *Trudeau v. FTC*, 456 F.3d 178, 186-87, 190 (D.C. Cir. 2006); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949); *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

### 2.    The Directive Is Ultra Vires Because It Exceeds the Export-Control Authority Congress Conferred

Nonstatutory review reaches agency action taken "entirely in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (internal citations omitted) (quoting *Bhd. of Ry. & S. S. Clerks, Freight Handlers, Exp. & Station Emp. v. Ass'n for Benefit of Non-Cont. Emp.*, 380 U.S. 650, 660 (1965). An agency violates a "clear and mandatory" statutory command only when the error is "so extreme that one may view it as jurisdictional or nearly so." *Changji Esquel Textile*, 40 F.4th at 722 (internal citations omitted). That exception is unavailable where a statutory scheme "provides aggrieved persons "with a meaningful and adequate opportunity for judicial review." *Nuclear Regul.*, 605 U.S. at 681.

Here there is none: § 4821(a) withdraws the only ordinary review mechanism – APA review – and the directive afforded Legion no license, exemption, reconsideration, stay, or appeal. (Compl. ¶ 59.) Unlike the petitioners in *Nuclear Regulatory Commission*, who had a guaranteed alternative path and merely "dress[ed] up a typical statutory-authority argument as an ultra vires claim," 605 U.S. at 666, Legion challenges a genuine, jurisdictional defect. BIS has suspended access to an item its control list does not reach, by reading "export" to cover a transaction the

EAR's definitions exclude. The directive transgresses ECRA's and the EAR's clear and mandatory limits in several independent respects, any one of which is dispositive.

First, there is no operative control-list classification to enforce. ECCN 4E091 – the only classification that ever directly controlled advanced AI model weights – was rescinded on May 13, 2025, with no replacement, and no currently operative ECCN or other provision of the Commerce Control List classifies access to a hosted AI model, or its inferential text output, as a controlled export. (Compl. ¶ 61.) An agency administering a control list acts outside its delegated authority when it suspends access to an item the list does not reach; the Government cannot enforce a control that does not exist.

Second, the directive regulates conduct outside the EAR's definition of an "export." The EAR's deemed-export framework reaches only the release of "technology" or "source code" – expressly "but not object code" – and requires that the controlled information itself be released to the foreign national. 15 C.F.R. §§ 734.13, 734.15. Providing a person access to a commercially hosted model that accepts text prompts and returns text outputs releases no source code, model weights, training data, or required technical know-how; the user receives only inferential text output. (Compl. ¶¶ 63-64.) No "technology" or "source code" within the meaning of the EAR is exported, re-exported, or deemed exported.[3]

Third, the two statutory hooks the letter invokes do not authorize the directive. On information and belief, the letter invokes 50 U.S.C. § 4817(b)(1) and 15 C.F.R. § 744.22(b). (Compl. ¶ 65.) Section 4817(b)(1) authorizes controls – "including through interim controls (such as by informing a person that a license is required for export)" – only on "technology identified

---

[3]    The *Salerno* doctrine's "no set of circumstances" test is inapplicable here.  As the D.C. Circuit squarely held "the Salerno standard does not apply" when a court evaluates "the validity of a regulation [or agency action] challenged as facially incompatible with governing statutory law."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998).

pursuant to subsection (a)," and subsection (a) requires an interagency identification process that, by statute, "shall ... include a notice and comment period." 50 U.S.C. § 4817(a)(2)(C), (b)(1). Neither occurred, so there is no validly identified technology to which any control could attach; and a license requirement that remains in effect indefinitely "until further notice" is not genuinely "interim." (Compl. ¶ 66.)

Section 744.22(b)'s "is informed" authority is confined to an "unacceptable risk" of use in or diversion to a "military-intelligence end use" or by a "military-intelligence end user" from Belarus, Burma, Cambodia, the People's Republic of China, Russia, or Venezuela, or a Country Group E:1 or E:2 country. 15 C.F.R. § 744.22(a), (f). The directive identifies no such end use, no such end user, and no nexus to any enumerated country, yet sweeps in every foreign person worldwide. (Compl. ¶¶ 67-68.) A provision authorizing targeted, risk-based restrictions does not authorize a universal prohibition. The letter's separate citation to 50 U.S.C. § 4813(a)(15) supplies no substantive authority; it is the procedural mechanism for "informing a person" that a license is required. (Compl. ¶ 65.)

Fourth, the directive overrides the nationality-based limits Congress and BIS built into the EAR. Section 734.20(b) authorizes releases of controlled technology and source code to bona fide employees who are nationals of Country Group A:5 countries – including Canada – without an individual license. 15 C.F.R. § 734.20(b). These are structural limits that define the outer boundary of the deemed-export framework, not optional policy preferences. A directive that obliterates the allied-adversary distinction and sweeps in Legion's Canadian-national engineers exceeds the authority the EAR confers. (Compl. ¶ 70; Rothrock Decl. ¶ 18.)

Fifth, the directive is irreconcilable with the President's own contemporaneous Executive Order. Section 3(c) of the June 2, 2026 Executive Order disclaimed authority to create "a

15

mandatory governmental licensing, preclearance, or permitting requirement for the development, publication, release, or distribution of new AI models, including frontier models." (Compl. ¶ 71.) The directive imposed exactly that, ten days later, under threat of "prompt criminal and civil penalties." Where the Executive publicly disclaims a power and then exercises it, the inference that no statute confers the power is compelling. (Compl. ¶ 71.)

Finally, the retaliatory context confirms the directive is not an exercise of delegated export-control judgment. Courts in this District have recently and repeatedly refused to let a "national security" label immunize government action whose real object is retaliation. In *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, the court held a presidential order "on its face, retaliation for the firm's protected" conduct, 784 F. Supp. 3d 127, 151 (D.D.C. 2025), and that, where the order failed to explain how the target's conduct "threatened national security" or how the restriction "would remedy those threats," "the Order's unsupported assertion of national security will not save it," *id.* at 157. *Accord Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 157, 168 (D.D.C. 2025) (where the target's protected conduct is "the only reasons provided by the Order itself," the action "serves no legitimate government interest, but only the interest of retaliation"). The same reasoning applies to a directive that deploys export-control machinery to punish a company for declining unrestricted government use of its products. Each of these defects is a patent departure from a "specific prohibition" in ECRA and the EAR – the kind of extreme, jurisdictional error that nonstatutory review reaches – and renders the directive ultra vires and void. *See Nuclear Regul.*, 605 U.S. at 681; *Changji Esquel Textile*, 40 F.4th at 722.

### 3. In the Alternative, the Directive Violates IEEPA and the Berman Informational-Materials Exemption

To the extent the directive rests on IEEPA authority, it is an exercise of power that 50 U.S.C. §§ 1701 and 1702 confer upon the President – not upon any subordinate agency. The

President is not an "agency" within the meaning of the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Legion's challenge proceeds as a nonstatutory ultra vires action in equity. The D.C. Circuit "has long recognized the availability of non-statutory review" of "the legality of presidential" action. *Chamber of Commerce*, 74 F.3d at 1327-28; see *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C.), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021) (construing challenges to presidential action under § 1182(f) as cognizable "outside of the APA"). IEEPA's only reference to judicial review, 50 U.S.C. § 1702(c), is a disclaimer – it provides that the subsection "does not confer or imply any right to judicial review" – not a preclusion of review otherwise available under 28 U.S.C. § 1331 and § 702.

The Berman Amendment forbids the directive. IEEPA withholds from the President any "authority to regulate or prohibit, directly or indirectly," the importation or exportation of "any information or informational materials ... regardless of format or medium of transmission." 50 U.S.C. § 1702(b)(3). The expressive outputs that Legion and its personnel receive from the Fable 5 model – drafted text, written legal analysis, summaries, and similar composed material – are informational materials within the meaning of the statute: finished expressive content delivered to the recipient, not a service to create materials not yet in existence. (Compl. ¶¶ 81, 83.) Commanding Anthropic to essentially suspend all access is precisely the "indirect" regulation of informational materials the Amendment forbids. A court in this District enjoined an IEEPA order on exactly this ground, holding that an order shutting down a digital platform "indirectly" regulated "informational materials" "regardless of ... medium of transmission" and "whether commercial or otherwise." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 81 (D.D.C. 2020); see *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103-04, 109 (D.D.C. 2020) (granting a preliminary injunction on the same

basis). Any narrower agency construction of the exemption is entitled to no deference. The Court determines the statute's meaning de novo. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024).

The directive also lacks IEEPA's mandatory predicate and asserts a major-questions power. IEEPA authority "may only be exercised to deal with an unusual and extraordinary threat ... which has its source in whole or substantial part outside the United States" and "with respect to which a national emergency has been declared." 50 U.S.C. § 1701(a), (b). No national emergency has been declared as to the code-analysis capability of a commercially hosted AI model, and the purported threat – a jailbreak of a model developed by a U.S. company, hosted in the United States, and offered through a U.S. platform – does not have its source outside the United States. (Compl. ¶ 84.) Independently, the directive asserts authority of vast economic and political significance – a de facto licensing regime under which frontier models must "go through the administration" before reaching the public – that IEEPA does not clearly confer. (Compl. ¶¶ 85-86; RJN Ex. 5.) Under the major-questions doctrine, an assertion of that magnitude requires "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The Supreme Court has rejected any "exception to the major questions doctrine" for emergency or foreign-affairs statutes and confirmed that IEEPA must be read within its limits. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 642 (2026).

### 4. The Directive Is Arbitrary and Capricious Under the APA

To the extent the directive is reviewable under the APA – including as the reasoned-decisionmaking component of Legion's ultra vires claims – it must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The directive is final agency action. It marks the "consummation" of BIS's decisionmaking and is one "by which rights or obligations have been determined, or from which legal consequences will

18

flow," because it legally compelled Anthropic to suspend access under threat of penalties. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The directive fails the reasoned decisionmaking standard in at least four independent respects. *See Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

First, there is no rational connection between the stated basis and the action taken. The Government recalled a mass-market product deployed to hundreds of millions of users based on a narrow capability that the product's own manufacturer publicly stated "is widely available from other models," and suspending Fable 5 and Mythos 5 does nothing to prevent that capability from being accessed through competing products – including OpenAI's GPT-5.5 – that remain fully available. (Compl. ¶¶ 102-03; Rothrock Decl. ¶ 19, Ex. C; RJN Ex. 4.) The action is thus irrational on its own terms and "runs counter to the evidence." *State Farm*, 463 U.S. at 43.

Second, the directive is materially underinclusive. The Government restricted only Anthropic's two models while leaving the identical code-analysis capability available through competing models, and never explained why the same capability is a national-security threat when supplied by Anthropic but not when supplied by others. (Compl. ¶ 103.)

Third, the Government failed to consider obvious less-restrictive alternatives. It could have restricted access only for nationals of adversary nations, imposed use-case limitations, or required enhanced screening – any of which would have addressed the stated concern without a worldwide bar. (Compl. ¶ 104.) The complete absence of any consideration of an obvious alternative within the standard's ambit is the hallmark of arbitrary action.

Fourth, the Government failed to consider serious reliance interests. Legion and other commercial customers had lawfully licensed and integrated Fable 5 before the directive issued without notice, evidence, or any opportunity to be heard. An agency "must be cognizant that

19

longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (internal citations omitted); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016). The Government ignored them entirely. (Compl. ¶ 106.)

Finally, the directive bears the hallmarks of pretext. "[J]udicial review is to be more than an empty ritual." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). An agency must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id*. at 756. A reviewing court is "not required to exhibit a naiveté from which ordinary citizens are free," *id*. at 785, and a "strong showing of bad faith or improper behavior" permits the court to look behind a rationale that appears contrived, *id*. at 755; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). The means cannot achieve the stated end (the capability remains available elsewhere). The directive issued within hours of outreach by Anthropic's commercial rivals, with no disclosed risk assessment; and it followed an escalating, publicly retaliatory campaign against the same company. (Compl. ¶¶ 110-114; RJN Exs. 2, 5.) Compounding the inference of improper motive, the Department of Commerce – whose Bureau issued the directive – is itself the subject of a pending request by Members of Congress that its Inspector General investigate the Secretary of Commerce's alleged conflicts of interest involving the artificial-intelligence and data-center industries. (RJN Ex. 3.) As this District has held, an "unsupported assertion of national security will not save" action whose real object is retaliation. *Wilmer Cutler*, 784 F. Supp. 3d at 157; *accord Perkins Coie*, 783 F. Supp. 3d at 168.

### B.    Legion Will Suffer Irreparable Harm Absent Injunctive Relief

This Circuit sets a high standard for irreparable injury. First, the injury "must be both certain and great; it must be actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury must also be "of such imminence that

there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at 297 (internal citations omitted). "It is also well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Economic loss is irreparable in two circumstances, both present here: (1) "monetary loss ... threatens the very existence of the movant's business" and (2) "where the claimed economic loss is unrecoverable." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012).

Legion's losses are unrecoverable. Because Legion's claims sound against the federal sovereign, the § 702 waiver permits only relief "other than money damages," so Legion can never recover its losses in damages. "Specifically, where economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable even if it would not wipe the business out." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (internal citations omitted); (Rothrock Decl. ¶ 24.)

Legion's losses also threaten the existence of its business. "However, economic loss that threatens the survival of the movant's business can amount to irreparable harm." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011). For an AI-native company, continuous access to the most capable frontier model is the foundation of the product and of the ability to compete; frontier capability advances on a timescale of weeks, and each day of lost access pushes Legion further behind competitors who retain uninterrupted access – competitive ground that cannot be recovered after the fact. (Rothrock Decl. ¶¶ 21-24.) Unlike the large incumbents whose injuries were found speculative or immaterial in *Cardinal Health* and *National Mining*, Legion is a startup whose entire product is built on the licensed Fable 5 model, and its injury is immediate, certain, and unrecoverable.

21

The directive's across-the-board suspension does not harm all developers alike: frontier access is the force multiplier that lets a small, senior team out-build far larger and better-funded competitors.  Stripping it away allows those competitors' structural advantages in headcount and capital to reassert themselves for as long as the directive stands. (Rothrock Decl. ¶ 21.)

Legion's injury is traceable to the directive and redressable by an injunction. Anthropic suspended access solely because the directive compelled it to do so, and the suspension persists only while the directive remains in force. Traceability "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169 (1997). Legion is itself an object of the directive, which prohibits Anthropic from providing Fable 5 to Legion's engineers; "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 112 (2025) (internal citations omitted). Redressability requires only "a predictable chain of events" that would likely result from judicial relief." *Id.* at 121. Here the chain is a single, commonsense step: vacate the directive and Anthropic – which has publicly opposed it – will restore access. (Rothrock Decl. ¶ 17.)

### C.    The Balance of Equities and the Public Interest Overwhelmingly Favor Legion

Because the Government is the opposing party, the balance-of-equities and public-interest factors merge. *Nken*, 556 U.S. at 435. The Government has no legitimate interest in enforcing an ultra vires directive that regulates conduct its own framework does not reach, that does nothing to prevent the identified capability from being accessed through competing products, and that bars nationals of close treaty allies whom the EAR's own framework would permit. "The Government cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns. And, as courts in this District have recognized, "The

public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal citations omitted).

"There is generally no public interest in the perpetuation of unlawful agency action" to the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (quotation marks omitted). A "national security" label does not change this calculus, for "concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see Wilmer Cutler*, 784 F. Supp. 3d at 157.

### D.    The Bond Should Be Nominal or Waived

Under Federal Rule of Civil Procedure 65(c), a district court "has power not only to set the amount of security but to dispense with any security requirement whatsoever where the restraint will do the defendant no material damage" or where there "has been no proof of likelihood of harm." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (internal citations omitted). The Government will suffer no cognizable financial harm from an injunction restoring Legion's access to a commercially deployed service that the directive had no lawful basis to revoke. A nominal bond of $1,000 – or waiver – is appropriate.

## V.    CONCLUSION

The Government suspended a commercial AI product used by hundreds of millions of people based on a capability the product's own manufacturer says is universally available – without statutory authority to regulate hosted model access, without disclosed evidence, and without any process. Legion respectfully requests that the Court issue a preliminary injunction (1) restraining Defendants from enforcing the June 12, 2026 directive; or, in the alternative, restraining Defendants from enforcing the June 12, 2026 directive against Legion, its employees, and its

contractors; (2) directing Defendants to take all steps necessary to permit Anthropic to restore Legion's access to the Fable 5 model during the pendency of this action; and (3) setting bond at a nominal amount or waiving it. Plaintiff does not by this Motion seek a temporary restraining order, and expressly reserves the right to seek emergency relief should the directive give rise to a more concrete or imminent deprivation, including restoration of access on a citizenship-restricted basis that bars Plaintiff's foreign-national personnel.

Dated: June 23, 2026                    Respectfully submitted,

By:    /s/
Diana Lyn Curtis Shutzer (D.C. Bar No. 1670689)
Gregory L. Ewing (D.C. Bar No. 484684)
Nicholas T. Solosky (*pro hac* forthcoming)
**SPENCER FANE LLP**
1233 Twentieth St NW, Suite 600
Washington, DC 20036
dshutzer@spencerfane.com
gewing@spencerfane.com
nsolosky@spencerfane.com
Tel:  (202) 293-0444

Jeffrey Ratinoff (*pro hac* forthcoming)
**SPENCER FANE LLP**
225 West Santa Clara Street, Suite 1500
San Jose, CA 95113
jratinoff@spencerfane.com
Tel:  (408) 286-5100

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on June 23, 2026, I electronically filed or caused to be filed the foregoing with the Clerk of the Court using the ECF system, which will in turn provide notice to all parties of record.

*/s/   Gregory L. Ewing*

Gregory L. Ewing (Bar No. 484684)
1233 Twentieth St NW, Suite 600
Washington, D.C. 20036
Tel: 202.293.0444
gewing@spencerfane.com
