**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

LEGION LEGALTECH, CORP.,

Plaintiff,

v.

UNITED STATES OF AMERICA, *et. al.*,

Defendants.

Case No.  1:26-cv-2225

**DECLARATION OF ARTHUR E. ROTHROCK IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Arthur E. Rothrock, declare as follows:

1.      I am the founder and Chief Executive Officer of Plaintiff Legion LegalTech, Corp. ("Legion"). I submit this declaration in support of Legion's Motion for a Preliminary Injunction. Except where I state that a matter is on information and belief, the facts set forth below are based on my own personal knowledge, and if called as a witness I could and would testify competently to them; as to matters stated on information and belief, I believe them to be true.

2.      This declaration explains (a) my background and the basis for my knowledge and opinions; (b) what Legion is, what we have built, and how we built it; (c) Legion's reliance on Anthropic's Fable 5 model; (d) the June 12, 2026 directive and its immediate effect on Legion's operations and personnel; and (e) why the loss of access to Fable 5 inflicts irreparable, compounding, and existential harm on Legion that no later remedy can undo.

**BACKGROUND AND BASIS FOR KNOWLEDGE**

3.      I am a practicing litigator and have been for nearly ten years. I graduated from Santa Clara University School of Law in 2016, was admitted to the California Bar that year, and have

practiced in the San Jose and greater San Francisco Bay Area exclusively as a litigator. Before founding Legion, I practiced at Hopkins & Carley (now Lathrop GPM LLP). I also founded my own litigation firm, Rothrock Legal, where I maintain an active, AI-forward litigation practice. I have been recognized as a Northern California "Rising Star" by Super Lawyers each year from 2020 through 2026 and named to Best Lawyers "Ones to Watch" from 2024 through 2026.

4.      I am unusually positioned to describe the matters in this declaration because I occupy three roles at once: I am a practicing litigator who uses these tools on real cases; I am the founder and CEO of a company built on them; and I am one of the engineers who personally designs and builds the software. I still practice and litigate, which means I use Legion's tools in my own cases, see where they fall short, and improve them directly. That combination – lawyer, builder, and daily user of frontier AI – is the foundation for the opinions I give below.

5.      I have used frontier artificial-intelligence tools intensively since December 2022. I subscribed to ChatGPT Plus as soon as it became available in February 2023, and since then I have worked daily across the leading frontier systems, including Anthropic's Claude, OpenAI's ChatGPT, Google's Gemini, and xAI's Grok, as well as a range of locally run models. I use these tools every day, both in my law practice and in building Legion. I personally test frontier models for their fitness for specific legal tasks and select the best-performing model for each function in our platform – extraction, synthesis, research, and drafting. The amount of time and resources that Legion and I have spent on applied-AI research and development is substantial.

6.      I am deeply engaged in the professional community at the intersection of AI and law. I serve on the steering committee for the American Bar Association's AI & Robotics National Institute. I have presented continuing-legal-education programs on the practical uses and pitfalls of AI in legal practice for the Silicon Valley Bar Association, the Monterey County Bar

Association, the INCBA, the American Inns of Court, CEB, and others. I have been an invited speaker and panelist at the University of California, Berkeley School of Law, and at Santa Clara University School of Law, including its Kasner Symposium. I also host the Litigator's Path podcast, where I speak with litigators across the country about their practices and their use of AI. Through this work I am closely familiar with the legal-technology industry and the capabilities and competitive dynamics of frontier AI models.

## LEGION, WHAT WE HAVE BUILT, AND HOW WE BUILT IT

7.    Legion builds AI-powered litigation and drafting software for attorneys. Our mission is to expand access to justice by making high-quality legal work faster and more affordable. We formed the company in April 2024, and in January 2025 we began building the current platform. We shipped our document automation for complaints in March 2025, and by spring 2026 we had extended the platform across the litigation lifecycle – pleadings, written discovery, discovery responses and objections, and full motion practice, including memoranda of points and authorities that support motions, oppositions, replies, and other briefs. In my opinion no competing product – including general legal-research platforms and other AI legal-drafting tools – matches Legion's quality of output, depth of litigation-specific tooling, and user experience, and none can match the speed at which we develop, test, and deploy new capabilities.

8.    Our speed to market and agility is possible because of the way we built the company. We have invested in engineering and in the complete integration of AI into every function of the business – software development, legal-content creation, testing, marketing, and drafting workflows themselves. The result is that an exceptionally small, senior team has built and continues to operate a platform of substantial scale and complexity: a multi-model AI document-generation pipeline that produces more than two dozen distinct litigation document and workflow

3

types, jurisdiction-specific legal logic, a real-time collaborative document editor, and the full cloud infrastructure and automated testing that support a production legal product. It is my understanding that to build and maintain a platform of this scope would conventionally require a team many times our size.

9.      I am one of the engineers building the platform. I designed the AI systems and processes through which Legion produces work product, I personally built several of the document-generation workflows in production today, and I created nearly all of the substantive content on our website, including our articles, interactive demos, and litigation guides. AI is the core of how we build and how our product works.

**LEGION'S RELIANCE ON FABLE 5**

10.      Legion is a commercial customer of Anthropic, PBC ("Anthropic"). We access Anthropic's frontier models through business accounts under its organization, including Anthropic's agentic coding tool, which Legion's developers used to build its platform, and through Amazon Web Services' Amazon Bedrock platform for pre-production testing, in each case under Anthropic's applicable commercial terms. Legion accesses these models through the Anthropic API under Anthropic's Commercial Terms of Service. Additionally, Legion maintains a Zero Data Retention ("ZDR") agreement with Anthropic. A true and correct copy of that ZDR agreement is attached as Exhibit A. Our commercial relationship with Anthropic was in full force and effect on June 12, 2026, and Legion was actively using Anthropic's models, including the Fable 5 model, when the directive issued.

11.      Anthropic released Fable 5 on June 9, 2026. From its release until the government's action on June 12, Legion was using Fable 5 actively in the development of its platform. Although we had not yet deployed Fable 5 as a feature within the product, the model was integral to building

4

that product. Specifically, two of Legion's software engineers were using Fable 5 in active development work. A third engineer, who will join Legion at the end of June 2026, was slated to use it as well. I personally used Fable 5 both for active software development and to evaluate its fitness for Legion's litigation-drafting work. Other than myself, all of my software developers are based in Canada. My own use was intensive: in the few days Fable 5 was available to us, I incurred approximately $2,500 in overage charges for Fable 5 usage alone. When access was cut on June 12, it forced us off Fable 5 in the middle of several active and complex development projects. We have continued that work on prior-generation models, but no longer with the benefit of the most capable model available.

12.    In my direct experience, Fable 5 was markedly better than the other models we use at understanding our codebase as a whole and at planning and executing large, complex feature build-outs reliably. The work we do is among the most demanding for an AI coding model: long-horizon changes that span many files and every layer of the system at once – database migrations, backend models and routers, the AI prompt layer, document-drafter templates, regenerated API clients, the front-end application, and the test suites – where the layers must stay mutually consistent or the build fails. Much of this work also proceeds in stacked, interdependent stages that must be coordinated and integrated in sequence. This is precisely the kind of work in which the difference between a frontier model and a prior-generation model shows up most: sustained focus across many steps, getting the integration right the first time, and introducing fewer regressions that must then be found and fixed.

13.    From my direct experience as the engineer who drove the work, Fable 5 enabled me to complete several substantial feature build-outs in a matter of days, with little iteration and few breakages – each of which touched the full stack and had to satisfy strict, jurisdiction-specific

5

legal-correctness requirements. It is my assessment, based on my daily use of both models, that the prior-generation models now available to us, including Opus 4.8, would not have produced these results in that timeframe without significant additional rework, iteration, and repeated testing and quality-assurance cycles. The capability I lost when Fable 5 was suspended therefore translates directly into slower development: work that took days on Fable 5 will take materially longer on the models that remain available to us, and that lost velocity compounds for as long as the directive remains in force.

14.     Another capability set Fable 5 apart from earlier models and from the alternatives now available to us: its willingness to sanity-check ideas and push back on questionable engineering decisions. Earlier models tend to agree with almost any approach a user proposes and to generate supporting rationales even for weak ones. Fable 5 was markedly better at challenging assumptions and explaining why a different approach was preferable. That matters enormously to Legion. We maintain a large and intricate codebase in which architectural decisions carry long-term consequences, and we need a model that functions as a genuine critical-thinking partner rather than one that merely validates whatever it is told. In my assessment, that capability directly improves the quality and durability of what we build.

15.     My direct experience with Fable 5 also contradicts the premise that the model posed the kind of security threat the government has invoked. In my use, Fable 5 was, if anything, unusually conservative about anything touching security or system access. On ordinary, entirely benign requests – such as asking it to check API documentation – the system automatically declined to use Fable 5 and downgraded my session to a prior-generation model. I asked for nothing improper; the model's safety controls triggered at even the faint suggestion of system intrusion or security assessment. Based on my own use, the deployed Fable 5 product was heavily

guarded against precisely the category of misuse the government's stated rationale describes. I have also followed discussion of these models among other users in public technology forums, and my understanding from that discussion – offered not for the truth of any other user's experience but as context for my own – is that this strict guardrail behavior was widely observed and not unique to me. That a commercially deployed model was this restrictive in ordinary use is difficult to reconcile with the contention that its general availability constituted an extraordinary national-security threat.

**THE JUNE 12, 2026 DIRECTIVE AND ITS IMMEDIATE EFFECT**

16.     I understand that on June 12, 2026, the United States government issued an export-control directive ordering Anthropic to suspend all access to its Fable 5 and Mythos 5 models by "any foreign national, whether inside or outside the United States, including foreign-national Anthropic employees." I first learned of the directive that same day, when I discovered that Legion's access to Fable 5 had been terminated, and I located and reviewed Anthropic's public statement about it on Anthropic's website. A true and correct copy of that statement, titled "Statement on the US government directive to suspend access to Fable 5 and Mythos 5," is attached as Exhibit B. Neither the government, nor Anthropic, nor any other source gave Legion any notice before access was terminated.

17.     As reflected in Anthropic's statement, Anthropic received the directive at 5:21 p.m. Eastern Time on June 12, 2026. Anthropic stated that the government's letter "did not provide specific details of its national security concern," that Anthropic had reviewed the capability at issue and determined it "is widely available from other models (including OpenAI's GPT-5.5)," and that Anthropic disagreed "that the finding of a narrow potential jailbreak should be cause for recalling a commercial model deployed to hundreds of millions of people." To comply with the

directive, Anthropic disabled Fable 5 and Mythos 5 for every user worldwide – not only foreign nationals – including Legion. Based on Anthropic's public statements, it is my understanding that Anthropic suspended access solely to comply with the government's directive, that its current suspension as to all users is a direct product of the directive and persists only because the directive remains in force, and that nothing other than the government's order is keeping Fable 5 and Mythos 5 unavailable to Legion. On that same understanding, it stands to reason that Anthropic would restore Legion's access if the directive were set aside or enjoined.

18.     Legion's software engineers live and work remotely in Canada. Two of my Canada-based software engineers are Canadian nationals. I understand that Canada is a close treaty ally of the United States, a Five Eyes intelligence partner, and a Country Group A:5 nation under the Export Administration Regulations. These engineers use Anthropic's models daily to perform the software-engineering work for which Legion engaged them. Two of the three were directly impacted the moment access was cut; the third, who joins Legion at the end of June 2026, will be impacted as soon as he begins. As noted, I am the only other active contributor to Legion's platform codebase, and I am a U.S. citizen. The directive therefore falls squarely on the engineers who build our product, barring them from a tool Legion is lawfully licensed to access, without any distinction between nationals of a close ally like Canada and nationals of adversary states.

19.     The code-analysis capability the government vaguely cited as the basis for the suspension remains available to me right now through competing products that the directive did not restrict. In particular, I maintain a ChatGPT account through which OpenAI's GPT-5.5 model remains available for my selection and use as of the date of this declaration. A true and correct copy of a screen capture I made on June 13, 2026 of the model selector in my ChatGPT account, showing GPT-5.5 ("Latest - 5.5") available for selection, is attached as Exhibit C.

**IRREPARABLE AND EXISTENTIAL HARM TO LEGION**

20.     The suspension has caused, and continues to cause, immediate and ongoing harm to Legion's development, its product, and its operations. It abruptly forced us off Fable 5 in the middle of active development projects, deprived the engineers who build our product of the model they had integrated into their daily work, and cut off my own use of Fable 5 in both development and litigation evaluation.

21.     The harm to Legion is existential. Frontier AI advances on a timescale of weeks. For an AI-native litigation-technology company like Legion, continuous access to the most capable commercially available model is the foundation of both the product and our ability to compete. Our entire advantage rests on building faster and better than anyone else in our domain by integrating the best available frontier model into every part of how we work. That advantage is not shared equally, and the directive's current, across-the-board suspension does not harm all developers alike. Frontier access is the force multiplier that lets a small, senior team like ours out-build far larger and better-funded engineering organizations; strip it away – as the suspension now does to everyone – and those competitors' structural advantages in headcount and capital reassert themselves, allowing better-resourced teams to build faster than a team of our size for as long as the directive stands. Should this directive be allowed to stand and Anthropic is able to comply with it by providing limited access to U.S. Citizens only, then each week we are denied access to Fable 5 our competitors advance in capability and we fall behind. That lost ground cannot be recovered after the fact: restoring access weeks or months from now does not undo the gap that accrues in the meantime.

22.     It is my considered opinion, informed by many years of building and deploying AI systems for legal work and by my continuous evaluation of frontier models against the demands of California litigation, that Legion's product and its development depend on access to the most

9

capable frontier model available at any given moment. We continue to function without Fable 5 using Anthropic's prior-generation Opus 4.8 and Sonnet 4.6 models. But in this field capability advances quickly, and being forced to build with prior-generation models while competitors retain access to the current frontier is itself the injury. The directive does not merely raise our costs. By cutting Legion off from Fable 5 while our competitors keep their frontier access, it forces a direct regression in the capability on which our product and development depend and inflicts a competitive loss that compounds every week it remains in force. Shipping a new production workflow roughly every four weeks has been Legion's typical cadence. Based on my experience with Fable 5 in the few days it was available to us, I am confident that with Fable 5 Legion could ship a production workflow in less than a week.

23.    The directive states no expiration date, provides no process by which Legion can seek restoration of access, and remains in effect today. As a result, Legion's harm is not a one-time event but an ongoing condition that continues for as long as the directive stands. As of the execution of this declaration, access to Fable 5 and Mythos 5 remains suspended for all of Legion's users, including me, a United States citizen. The directive's present effect is therefore a total deprivation that falls on citizen and foreign national alike. Even if the manner of Anthropic's compliance were to change, the directive would continue to operate against Legion and its foreign-national engineers by its own terms: if access were restored only to those who are not foreign nationals, in order to comply with the directive's command barring "any foreign national," my Canadian-based engineers would remain barred from a tool Legion is lawfully licensed to access, even as I and any other United States-citizen personnel regained access. Only setting aside or enjoining the directive itself will restore Legion's access and end the harm; absent that relief, the harm continues to accrue. I make the statements in this paragraph concerning the current status of

access on personal knowledge, and the statements concerning the manner of Anthropic's future compliance on information and belief, based on Anthropic's public statements and the terms of the directive.

24.    These losses cannot be recovered as money damages against the federal government, and they cannot be repaired after the fact. The continued enforcement of the directive threatens the viability of Legion as a going concern. Only immediate injunctive relief restoring Legion's access to Fable 5 can prevent the irreversible harm the directive continues to inflict on Legion's business, its product, and its people.

### EXHIBITS

25.    Exhibit A is a true and correct copy of the Anthropic Zero Data Retention Certificate dated July 15, 2024.

26.    Exhibit B is a true and correct copy of the public statement issued by Anthropic, PBC on June 12, 2026, titled "Statement on the US government directive to suspend access to Fable 5 and Mythos 5," which I reviewed on Anthropic's website on June 12, 2026.

27.    Exhibit C is a true and correct copy of a screen capture I made on June 13, 2026 of the model selector in my ChatGPT account, showing OpenAI's GPT-5.5 model available for selection as of that date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 23, 2026, at San Jose, California.

_____
Arthur E. Rothrock

11